Michael JOHNSON and Pamela Johnson, Parents and Natural Guardians of Owen Johnson

v.

LANCASTER–LEBANON INTERMEDIATE UNIT 13, LANCASTER CITY SCHOOL DISTRICT, and Donald M. Carroll, Jr., Secretary of Education of the Commonwealth of Pennsylvania.

Civ. A. No. 90–1908.

United States District Court, E.D. Pennsylvania.

Feb. 19, 1991.

---

Jefferson C. Crosby, Lancaster, Pa., for plaintiffs.

Harry St. C. Garman, Hartman, Underhill & Brubaker, Lancaster, Pa., Claudia M.

Tesoro, Deputy Atty. Gen., Philadelphia, Pa., for defendants.

## OPINION

CAHN, District Judge.

In this action pursuant to the Education for the Handicapped Act ("EHA" or "Act"), 20 U.S.C.A. § 1400 *et seq.*, the parents of Owen Johnson, a hearing-impaired student in the Lancaster–Lebanon Intermediate Unit 13 public school ("IU–13" or "IU"), appeal the decision of the Secretary of Education, Donald Carroll, rejecting their challenge to Owen Johnson's Individualized Educational Program ("IEP"). This dispute began when the Johnsons objected to Owen's 1989–90 IEP and asked for a due process hearing to determine its adequacy. After the hearing officer's decision, both parties appealed to the Secretary of Education, pursuant to Pennsylvania's two-tier system of EHA administrative review.

After the Secretary of Education's decision, reversing in part the hearing officer's decision, the Johnsons filed a two-count complaint in federal district court, pursuant to § 615(e)(2) of the EHA, against the Lancaster City School District ("School District" or "District"), the IU–13, and the Secretary of Education. In Count I they allege that Owen's 1989–90 IEP is inadequate on several grounds and that he has therefore been deprived of the free appropriate public education to which he is entitled under the EHA. In Count II they contend that the Commonwealth's two-tier system of administrative review violates the EHA. The plaintiffs filed a motion for summary judgment on Count II of the complaint, which was denied. This court held a non-jury trial on January 3 and 4, 1991 to determine the merits of both counts of the plaintiffs' complaint. I also agreed to consider Owen's current IEP, the 1990–91 IEP, even though it was not considered at either level of administrative review.

From the administrative record, the parties' Stipulation of Facts, and the January 3–4, 1991 trial, I now make the following:

## I. FINDINGS OF FACT

A. Background

1. The plaintiffs are Michael and Pamela Johnson, the parents and natural guardians of Owen Johnson.

2. The defendants are Lancaster–Lebanon Intermediate Unit 13, Lancaster City School District, and Donald M. Carroll, Jr., Secretary of Education of the Commonwealth of Pennsylvania ("Secretary of Education" or "Secretary").

3. Owen Johnson was born on December 15, 1984. SF ¶ 2.[1]

4. Owen lives in Lancaster County, Pennsylvania with his parents and a sister, who is eleven years old. With the exception of Owen, all of them have full hearing. SF ¶ 4.

5. Owen lives in the area served by the defendant Lancaster City School District. SF ¶ 5.

6. At the age of ten months, Owen suffered a closed-head injury with cerebral spinal fluid ("CSF") leakage and ear injury. After surgery to repair the CSF leak, he suffered pneumococcal meningitis at the age of twelve months. SF ¶ 6.

7. After the accident but before he contracted meningitis, Owen could still hear and speak partially. HT at 16.[2]

8. Before he lost his hearing, Owen had a very sophisticated language ability for his age, including the ability to say words such as "Lassie" and "Bananas." HT at 16, 128.

9. Owen has kept many of the sounds he learned before he lost his hearing. HT at 109.

10. Because Owen had full hearing for the first ten months of his life, and because he still retains some of his early language ability, he is more likely to benefit from

---

**1.** "SF" refers to the Stipulation of Facts submitted by both parties prior to the January 3–4, 1991 trial.

**2.** "HT" refers to the transcript of the first day of trial before this court on January 3, 1991.

speech and language therapy and to have greater speech intelligibility than a congenitally deaf child. HT at 160–61.

11. Although his parents suspected hearing loss at an earlier time, Owen's hearing loss was not definitively diagnosed until July of 1987 by the Children's Hospital of Philadelphia ("CHOP"), approximately one year and seven months after his hearing loss. SF ¶ 7.

12. Owen was diagnosed as having, and continues to suffer from, a bilateral severe to profound hearing loss. SF ¶ 8.

13. Owen augments his residual hearing ability by continually wearing a Libby-Horne hearing aid in his left ear (the better ear), and he is able to detect limited sounds with the aid. SF ¶ 9.

14. Tests administered by the IU–13 and by privately retained experts show that Owen has attained nonverbal, including academic, skills at an average to high-average level. SF ¶ 10.

15. Owen has an intelligence quotient of 113. SR at 345.[3]

B. Schooling

16. During the 1986–87 school year Owen received speech therapy for fifteen minutes a week at the Easter Seal Society of Lancaster. SF ¶ 11.

17. On September 15, 1987 Owen enrolled in the IU–13 preschool class for hearing-impaired children. SF ¶ 12.

18. The IU–13 provides services to the District for handicapped preschool children in accordance with the EHA. SF ¶ 13.

19. During the 1987–88, 1988–89, and 1989–90 school years, Owen participated in the IU–13 preschool class for hearing-impaired students ages three to five, which met four days a week for half-day sessions. SF ¶ 14.

20. Owen's classroom teacher during the 1987–88, 1988–89, and 1989–90 school years, Sandra Rose, has taught hearing-impaired students for nineteen years, has a

B.A. in speech pathology and audiology for deaf education from Millersville University, and has an M.A. in elementary education from Millersville University. SF ¶ 15.

21. During the 1988–89 school year, Owen received thirty minutes of individual speech and language therapy per week and ten minutes of group language therapy per week from Stacey Knarr, a speech and language pathologist. SF ¶¶ 16, 18.

22. The ten minutes of group therapy consisted of observation of the classroom and occassional interactions with students by Ms. Knarr during the 20–25 minutes of snack time. HTII at 22 and 31.[4]

23. The snack time work of Ms. Knarr was of minimal benefit to Owen, was not included in his IEP as therapy because of the Johnsons' objections to it being classified as therapy, and was not mentioned as therapy during the administrative proceedings before Dr. Cibik. HTII at 48 and 70–73.

24. Stacey Knarr's qualifications include an M.S. in speech pathology from Syracuse University, a certificate of clinical competence in speech pathology from the American Speech Language and Hearing Association, a B.S. in speech pathology and audiology from West Chester State College, and eight and one-half years of clinical experience. SF ¶ 17.

25. During the 1989–90 school year, Owen received weekly speech and language therapy from Ms. Knarr in twenty and twenty-five minute sessions on different days in groups of no more than two students. In addition, Owen received speech and language instruction from Ms. Rose two days a week for twenty minutes a day in groups of not more than four students. SF ¶ 19.

26. The IU–13 Extended School Year Services Committee determined that Owen did not meet the criteria necessary for the 1989 Extended School Year ("ESY"), be-

---

**3.** "SR" refers to the Stipulated Record filed with this court, which contains the administrative record.

**4.** "HTII" refers to the transcript from the second day of the trial before this court, January 4, 1991.

cause he did not show a significant regression/recoupment disability. SF ¶ 20.

27. Under Owen's 1990–91 IEP he receives speech therapy in one thirty-five minute individual session and in one twenty-five minute group session (of not more than two students) each week on different days (sixty minutes per week in two sessions). HT at 23.

28. Owen's classroom kindergarten teacher for 1990–91 is Linda J. Eshleman, whose qualifications include a B.S. from Bloomsburg University of Pennsylvania in Special Education, an M.S. from Bloomsburg in Education of the Hearing–Impaired, and three and one-half years of experience teaching hearing-impaired children. Defendants' Exhibit 8.

29. Owen's speech therapist for 1990–91 is Mary R. Martin, a speech and language pathologist with an M.S. in Communication Disorders from Bloomsburg University and one year of clinical experience. Defendants' Exhibit 11.

## C. Instructional Theory

30. Owen's training has followed the "total communication" philosophy, which teaches hearing-impaired students to communicate simultaneously using both sign and verbal communication. The total communication method also utilizes the child's ability to increase receptivity to the verbal speech of others. SF ¶ 26.

31. The IU–13 and the parents agree that the total communication method is appropriate for Owen. SF ¶ 27.

32. The speech therapist works to improve Owen's ability to articulate sounds and to control the pitch, quality, duration, and intensity of his voice. SF ¶ 28, 29.

33. The speech therapist simultaneously works to increase Owen's receptive familiarity with sounds, using residual hearing and speech reading skills and training Owen's auditory and kinesthetic senses to discriminate between sounds. SF ¶ 30.

34. The speech therapist does not work on Owen's language skills, i.e., his ability to say and understand words and phrases

or to comprehend the same when spoken to him. HTII at 76.

35. The classroom teacher provides intermittent language work while providing academic instruction to Owen's class of six hearing-impaired pupils. HTII at 94–95.

36. The classroom teacher's role, when giving language instruction to reinforce the speech therapy, is to teach Owen to receive and express the sounds he has been exposed to with the speech therapist in the formation of words and sentences. SF ¶ 31.

37. The classroom teacher does not work on Owen's articulation or intelligibility and is not a certified speech pathologist. HT at 38–9; HTII at 26.

38. The IU has never varied the amount of therapy a student receives to account for whether the child's hearing loss is congenital or after birth. HT at 92.

## D. Private Therapy

39. Owen's parents, at their cost, provided Owen with supplemental speech therapy. SF ¶ 32.

40. Beginning in July 1988 and continuing through June 1989, Owen received supplemental speech and language therapy sessions at Willow Lakes Health Center from Patricia Fuehrer, a licensed speech pathologist, for 30–45 minutes twice a week on Tuesdays and Thursdays at 4:00 p.m. SF ¶ 33; HT at 22.

41. In contrast to the segregation of speech and language therapy in the IU–13 program, Ms. Fuehrer combines speech and language therapy in her sessions with Owen. HT at 48–50.

42. The combination of speech and language therapy means that Owen learns not only to produce sounds, but also to use those sounds to say words and phrases. In addition, when Owen speaks, Ms. Fuehrer works on his intelligibility. HT at 48–50.

43. Ms. Fuehrer and the IU cooperate in planning and implementing Owen's speech and language therapy. SF ¶ 34.

44. The therapy Owen receives from the IU–13 and from Ms. Fuehrer is inex-

tricably intertwined. HT at 90; HTII at 61.

45. Ms. Fuehrer's therapy benefits Owen. SR at 20; HT at 89.

46. From June of 1989 to January 28, 1990, Owen did not receive any therapy from Ms. Fuehrer or from anyone outside the IU–13. Therapy with Ms. Fuehrer resumed on January 28, 1990, was halted again in March of 1990, and resumed again on April 2, 1990. HTII at 161, 168.

47. During the period from June 1989 to January 28, 1990, the intelligibility and spontaneity of Owen's speech deteriorated. For example, his pronunciation of the word "later" deteriorated from "lador" to "wa-yor." HT at 19–20.

48. Owen's sound production improved in IU therapy sessions even without the Fuehrer therapy. HT at 76.

49. Owen's speech quality improved between June 1989 and March 1990 in terms of pitch, nasality, and control when stimulated, but he did not increase the amount of speech he was using or his language comprehension. HT at 111–13.

E. Owen's Progress Reports

50. Dr. Jerome Knast tested Owen on February 13, 1989, on February 24, 1990, and on December 15, 1990. SF ¶ 36; HT at 145.

51. Dr. Knast's qualifications include a Pennsylvania license to practice psychology and a Pennsylvania certification as a school psychologist, an M.A. from Notre Dame in psychology with specialization in mental retardation and developmental disabilities, and a Ph.D. from New York University in deafness rehabilitation. His experience includes acting as coordinator/psychologist for underachieving deaf and hearing-impaired adults at the Philadelphia Elwyn Institute, three years of experience as a school psychologist at the Pennsylvania School for the Deaf in Philadelphia, and six years of experience in private practice specializing in the treatment of deaf and hearing-impaired persons and their families. SF ¶ 37.

52. Owen made only two months of progress in overall speech and language ability from February 1989 to February 1990, testing at 2.4 years old in communication skills in February 1989 and 2.6 years old in February 1990. In February 1989 he ranked in the 44th percentile of communication skills compared to other hearing-impaired children; in February 1990 he dropped to the 30th percentile. HT at 147.

53. Owen made 16 months of progress from February 1990 to December 15, 1990, correlating with the resumption of private therapy by Ms. Fuehrer in February 1990. HT at 152, 168.

54. Owen's 1990–91 IEP is not sufficiently different from the 1989–90 IEP to account for Owen's dramatic improvement from February–December 1990. HT at 123–24.

55. As of December 15, 1990 Owen was still below average in oral communication abilities compared to other deaf children of his age and intelligence. Oral communication is essential to overall educational and vocational advancement for a deaf child. HT at 154.

56. Owen's greatest shortcomings still lie in his speech intelligibility and general verbal-oral communication. HT at 153.

57. Owen needs intensive speech and language therapy to improve his intelligibility and generalized ability to speak. HT at 168.

58. In his February 1989 report, Dr. Knast recommended a total of three hours of speech and language therapy a week in four sessions: three 45 minute sessions of individual therapy and one 45 minute session with another student. HT at 118.

59. Dr. Knast's recommendations are enough to provide meaningful benefits to Owen but are not enough to maximize his development. HT at 119, 122.

60. Extra therapy should be provided within school hours, because Owen is tired after school and cannot learn as much then. HT at 31, 166.

61. There is time at the end of Owen's school day on Tuesdays and Thursdays from 3:00 p.m. to 3:20 p.m. for Owen to

receive extra speech and language therapy. HTII at 123.

62. On Mondays Owen receives speech therapy from 2:25 p.m. until 3:00 p.m. HTII at 123.

63. Judith Ann Giovannitti evaluated Owen in June 1989. Her qualifications include an M.A. in speech pathology from the University of Pittsburgh, a certificate of clinical competence from the American Speech and Language Association, and twenty years of experience as a speech and language pathologist. SF ¶ 38.

64. Ms. Giovannitti's tests showed that Owen's speech skills are several years behind hearing-impaired children of his age and intelligence, that Owen can make a variety of sounds when stimulated to do so, but cannot understand their meaning, that Owen's spontaneous speech is still lacking, that he is unintelligible in conversational speech, and that he has a strong voice and high stimulability for sound production compared with other deaf children. SR at 127, HT at 57–60 and 73.

65. Based on her tests, Ms. Giovannitti recommended a major emphasis on Owen's speech skills through three to five sessions of therapy a week on different days. SR at 128, 134–35.

66. Because Owen's speech skills are so far behind his academic skills, unless his speech skills improve dramatically he will be unable to be an active participant in a mainstream classroom. SR at 136; HT at 127.

67. Owen's late diagnosis of hearing impairment means that he should get more therapy, not less. HT at 129 and 132.

68. Ms. Giovannitti retested Owen on March 26, 1990. SF ¶ 39.

69. On the March 26, 1990 test, Owen had a receptive communication age of 3–3.5 years and an expressive communication age of 2–2.5 years. Expressive communication includes speech production. HT at 107.

70. The March test showed many errors in Owen's articulation, as well as difficulty with nasality. Owen was still talking a lot in the front of his mouth and showing many errors that would need correction before he could improve his speaking ability. He was very stimulable but poor at carrying sounds over into conversation and poor in intelligibility. HT at 109.

F. Adult Hearing–Impaired Role Models

71. Most hearing-impaired adults use American Sign Language ("ASL"), which does not involve voicing; hearing-impaired children are first taught to use Signed Exact English, a separate language that involves voicing and approximates grammatical English. HT at 200.

72. The IU–13 does not teach ASL until Middle School. HT at 201.

73. The IU–13 allows adult deaf role models to be brought into the classroom by the Junior National Association of the Deaf for middle and high school students. HT at 203; HTII at 106.

74. The Lancaster area has a large adult deaf population. HTII at 30, 105–06.

75. Owen has been taken to the First Deaf Mennonite Church once a month to meet adult deaf role models. SR at 206.

76. There are two other organizations in the Lancaster area that provide opportunities for interaction with hearing-impaired adults: Deaf Services, a United Way agency, and the Word of Life Lutheran Church. HT at 193.

77. An adult role model in Owen's classroom who uses only ASL might confuse the students and distract them from the teacher. HT at 43; HTII at 102.

G. Due Process Hearing

78. On June 23, 1989 the Johnsons expressed their disapproval of the IEP recommended by the IU–13 for the 1989–90 school year. SF ¶ 40.

79. The Johnsons requested a due process hearing in accordance with their rights under the EHA and related regulations. SF ¶ 41.

80. Edward P. Cibik, Jr., Ed.D., a Pennsylvania Special Education Hearing Officer, was assigned by the Secretary of Edu-

cation in accordance with Pennsylvania Due Process Procedures to convene a due process hearing. SF ¶ 42.

81. Dr. Cibik convened a due process hearing on August 24, 1989. SF ¶ 43.

82. Dr. Cibik rendered a decision dated September 12, 1989, to which both the parents and the IU–13 filed exceptions on or about September 28, 1989 and September 29, 1989. SF ¶ 44.

83. The issues determined by Dr. Cibik related to the Johnsons' request for the following educational program and services:

a. speech and language therapy from a qualified speech therapist on a one-to-one or one-to-two basis at least three times a week on different days for sessions of at least twenty minutes each;

b. a structured training program to assist the Johnsons, as parents, in helping Owen learn to communicate;

c. an extended school year program;

d. an adult signing aide on Owen's school bus; and

e. arrangements for a deaf adult person to visit Owen's classroom and interact with Owen at least one time per week. SF ¶ 45.

84. Dr. Cibik's decision dated September 12, 1989 was favorable to the parents on items a and b, partially favorable on item c, and adverse to the parents on items d and e. SF ¶ 46.

85. Pursuant to Pennsylvania's due process procedure under the EHA, both parties appealed the decision to the Secretary of Education. SF ¶ 47.

86. Following a review of cross exceptions filed by the parties, the Secretary issued an order adopting in part, modifying in part, and reversing in part Dr. Cibik's decision. SF ¶ 48.

87. The Secretary's decision, dated February 15, 1990, was served on the parents, through their counsel, on February 20, 1990. SF ¶ 49.

88. The essence of the Secretary's Order was to let stand Dr. Cibik's Order that Owen's eligibility for ESY services be eval-uated during the 1989–90 school year using information generated by the IU–13 and others, including the parents and private consultants who work with Owen. In all other respects the positions of the IU–13 denying the Johnsons' request were approved, and Dr. Cibik's other decisions favorable to the Johnsons were reversed. SF ¶ 50.

### H. Appeal to Federal Court

89. The plaintiffs filed suit in civil court pursuant to § 615(e)(2) of the EHA asking for the following relief:

(a) an order declaring Pennsylvania's two-tier system of administrative review in effect at the time of the Secretary's decision to be illegal;

(b) an order reinstating that portion of the hearing officer's decision favorable to the plaintiffs;

(c) an order reimbursing the Johnsons for the costs of Owen's private therapy sessions.

90. During the January 3–4, 1991 trial, the plaintiffs withdrew their claims for an adult signing aid on Owen's bus, because his transportation arrangements had changed. HT at 3.

91. During the January 3–4, 1991 trial, the plaintiffs withdrew their claim for reimbursement of the private therapy sessions conducted over the summers. The total amount of reimbursement asked for is now $1,745. HT at 3.

92. Finally, the plaintiffs withdrew their claim for weekly parental classes in sign language. HTII at 3–4.

93. The plaintiffs continue to ask for reimbursement for the remaining Fuehrer sessions, for the IU–13 to provide Owen with an extra two sessions of speech and language therapy on different days of the week within the school day by a speech pathologist, for Owen's admission into the Extended School Year program, and for an adult deaf role model to come to Owen's classroom for at least one to one and a half hours per week. HTII at 157–58.

## II. DISCUSSION

### A. Procedural Rulings

■ Section 1415(e)(2) of the EHA specifically states that the reviewing court

> ... shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

Although not all the Circuits concur, our Court of Appeals has held that review under the EHA is "practically indistinguishable from the usual civil actions in which issues are tried *de novo." Tokarcik v. Forest Hills School District,* 665 F.2d 443, 450 (3d Cir.1981).[5] Therefore, I have considered the stipulated record in this case, containing all evidence and proceedings from the two administrative reviews, *de novo.*

■ I also allowed both parties to present additional evidence at the January 3–4, 1991 trial. I permitted the plaintiffs to present Dr. Jerome Knast, Patricia Fuehrer, and Angela Bednarczyk as additional expert witnesses, to supplement the record with additional exhibits, and to call Mary Martin and Linda Eshleman as witnesses regarding the 1990–91 IEP. I allowed the defendants to call Michael Miklos as an additional expert witness. Finally, I agreed to consider Owen's 1990–91 IEP without making the plaintiffs first exhaust their administrative remedies.[6]

### B. The Education for the Handicapped Act

The EHA provides federal money to state and local educational agencies for the education of handicapped children in order to assure that all handicapped children have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of handicapped children and their parents or guardians are protected, to assist States and localities to provide for the education of all handicapped children, and to assess and assure the effectiveness of efforts to educate handicapped children.

20 U.S.C.A. § 1400(c). The Act conditions federal aid to the state and local agencies upon their compliance with the goals and procedures detailed in the Act. Under

5. The First Circuit characterized a district court's review of the administrative record under the EHA as "something short of a trial *de novo." Town of Burlington v. Department of Education,* 736 F.2d 773, 790 (1st Cir.1984), *aff'd,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), citing *Colin K. by John K. v. Schmidt,* 715 F.2d 1, 5 (1st Cir.1983).

6. Because of the importance of speedily resolving EHA cases and the similarity of the 1990–91 IEP to the 1989–90 IEP, I held that reexhaustion is not required here. *See DeVries by DeBlaay v. Spillane,* 853 F.2d 264, 267 (4th Cir.1988):

> ... since the scope of the district court's review under the EHA is more broad than that generally existent under review of administrative decisions, the need for exhaustion is not as clear as in the normal case of review of administrative decisions. Second, even under normal exhaustion rules, the plaintiff does not need to reexhaust. Plaintiff's claim ... is not affected by creation of the new IEP.... The Third Circuit has recognized that a remand is inconsistent with that statutory scheme (citing *Muth v. Smith* [646 F.Supp. 280 (E.D.Pa.1986) ] ). So too is reexhaustion inconsistent with the statutory scheme when

the complaint remains the same though the IEPs change.

Although this circuit has not ruled on the issue of reexhaustion, our Court of Appeals has held that

> ... in the context of the EHA a remand following an 'impartial review' is fundamentally inconsistent with the statutory scheme ... [T]he EHA and its implementing regulations reflect the importance not only of procedural protections but also of prompt resolution of disputes over the proper education of a handicapped child. Section 300.512 of the regulations, for example, imposes a stringent timetable that, absent reasonable requests for continuances, guarantees an administratively final and judicially reviewable decision no later than 75 days from the date of receipt of the request for a due process hearing. With respect to the 'impartial review' proceedings, § 300.512(b) specifically requires a state agency to 'insure ... [that] a *final* decision is reached in the review' within 30 days of receipt of the request for a review.

*Muth v. Central Bucks School Dist.,* 839 F.2d 113, 124–25 (3d Cir.1988), *rev'd on other grounds,* 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989).

§ 612 of the EHA, to receive federal assistance, States must prove to the federal government that they have "in effect a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C.A. § 1412(1). Section 614 of the Act requires that local or intermediate educational agencies and units submit an application to their state educational agency demonstrating policies and procedures they have adopted to meet the requirements of the Act before they may receive state funding.

The Act requires states and localities to meet the educational needs of each handicapped child through the preparation and implementation of an individualized educational program ["IEP"]. § 1414(a)(5). The IEP, prepared at a meeting between a representative of the local educational agency, the child's teacher, the child's parents or guardian, and where appropriate, the child, consists of a written document containing:

> (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

§ 1401(19). Local or regional educational agencies must review, and where appropriate revise, each child's IEP at least annually. § 1413(a)(11).

In addition, § 615 of the Act lays out an elaborate system of procedural safeguards to enforce the provisions of the EHA. Parents or guardians of handicapped children must be given "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." § 1415(b)(1)(E).

Complaints brought by parents must be resolved at "an impartial due process hearing," and appeal to the state educational agency must be provided if the initial hearing is held at the local or regional level. § 1415(b)(2). Finally, 20 U.S.C.A. § 1415(e)(4)(A) provides for federal court jurisdiction for "actions brought under this subsection without regard to the amount in controversy."

## C. Scope of Review

In the seminal case on the EHA, *Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Supreme Court interpreted § 1415 to require a twofold inquiry by a reviewing court. A reviewing court must ask, "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" 458 U.S. at 206–07, 102 S.Ct. at 3050–51. The first question deals with the procedures used to develop and implement the IEP, none of which are at issue here. The second question relates to the substantive requirements of the IEP, the heart of this litigation.

## D. Impartial Review

■ The plaintiffs' Motion for Partial Summary Judgment, which I denied in an Order dated September 21, 1990, contended that the Secretary's review of the hearing officer's decision on Owen's 1989–90 IEP violated § 1415(c)'s requirement that due process reviews under the EHA be conducted by an impartial agency. The plaintiffs argue that because the Secretary was not impartial, his decision should be vacated and the hearing examiner's decision should be reinstated, subject to the modifications asked for by the plaintiffs on their appeal from his decision. I agree that the Secretary's review was not impartial, and his decision is hereby vacated. However, as my decision to consider the merits of this case *de novo* indicates, I will not reinstate the hearing examiner's decision.

In *Muth v. Central Bucks School District*, 839 F.2d 113 (3d Cir.1988), *rev'd on other grounds sub nom., Dellmuth v. Muth*, 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989), the Court of Appeals held that the Secretary's review of hearing examiners' decisions is not impartial under § 1415(c) and therefore contravenes the EHA.[7] Subsequent to *Muth*, the Secretary reviewed the hearing officer's decision in this case, pursuant to appeal by both parties. At no time during the Secretary's review did the plaintiffs raise the issue of his impartiality.

The Secretary argues that this Court need not reach the issue of the Secretary's impartiality, because the two-tier system has been modified to remove the Secretary as a reviewing authority[8] and because this court must in any event make an independent factual determination on whether the IEPs violate the EHA. Therefore, the defendants argue that Count II of the plaintiffs' complaint is moot and, in view of this court's decision to review the record *de novo*, no longer bears on the ultimate issue in this case.

Although the Secretary's impartiality is moot for subsequent cases, it is relevant to my review of the administrative record, because I must give due weight to that record. *Polk*, 853 F.2d at 173 ("the district court must conduct an independent review based on the preponderance of the evidence but in doing so 'due weight shall be given to [state administrative] proceedings.'") (quoting *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051). The First Circuit recently stated that a district court

> ... must ... be deferential [to the administrative agency], recognizing 'the expertise of the administrative agency, ... consider[ing] the [agency's] findings carefully and endeavor[ing] to respond to the hearing officer's resolution of each material issue.' (Quoting *Burlington*, 736 F.2d at 791–92). Jurists are not

trained, practicing educators. Thus, the statutory scheme binds trial courts to give 'due weight' to the state agency's decision in order to prevent judges from 'imposing their views of preferable educational methods upon the States.' (Quoting *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051).

*Roland M. v. Concord School Committee*, 910 F.2d 983, 989 (1st Cir.1990).

The plaintiffs argue that the Secretary's decision to review their case after the *Muth* opinion, and the unlikelihood that the Secretary would invalidate his own administrative review scheme, excuses their failure to challenge the Secretary's impartiality, because it would have been futile. Brief in Support of Plaintiffs' Motion for Partial Summary Judgment at 11 (citing *Burr By Burr v. Ambach*, 863 F.2d 1071, 1077 (2d Cir.1988), *vacated and remanded*, 492 U.S. 902, 109 S.Ct. 3209, 106 L.Ed.2d 560, *aff'd*, 888 F.2d 258 (2d Cir.1989)).

The Secretary argues that because the plaintiffs appealed the hearing officer's decision to the Secretary, rather than directly to federal district court, "they cannot now be heard to complain that under the EHA the Secretary was not a proper 'second tier' reviewer." Defendant Carroll's Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment at 5 (citing *Colin K. by John K. v. Schmidt*, 715 F.2d 1, 5 (1st Cir.1983)). The Secretary also argues that even under *Ambach* the futility argument fails, because at the time of the Secretary's review, modifications to the two-tier system of review were being actively considered, and proposed new rules were published in the Pennsylvania Bulletin while the parties' cross-exceptions to the hearing officer's decision were pending. Thus, the Secretary argues:

> any assumption that the Secretary would have categorically rejected any and all procedural challenges to the existing scheme was questionable. Moreover, as

7. 839 F.2d at 124. The Supreme Court reversed on sovereign immunity grounds. Thus, the Court did not rule on the Secretary's impartiality in reviewing hearing officers' decisions. 109 S.Ct. at 2402 n. 3.

8. Effective July 1, 1990, new regulations promulgated by the Department of Education eliminate the Secretary as an administrative decisionmaker. 20 Pa.B. 3339 (June 16, 1990); §§ 14.-64, 14.71, 20 Pa.B. at 3355–56.

recognized in *Colin K.*, the Secretary was in any event entitled to notice of any procedural challenge at the earliest possible stage of the proceedings so that he could at least consider taking corrective action.

Defendant Carroll's Memorandum at 6 n. 4.

I find the plaintiffs' arguments more persuasive here, and, therefore, I find *Ambach* more appropriate to this case. Thus, I hold that the plaintiffs' failure to raise the issue of the Secretary's impartiality during his review is excused on the grounds of futility and that under *Muth* the Secretary's review was illegal.

Because the Secretary was not impartial and therefore not qualified to review a hearing officer's decision, his decision carries no weight in this court's review of the administrative record. This means that the hearing officer's decision carries more weight than ordinary, because, as the only impartial review of Owen's 1989–90 IEP, it contains the only agency findings that I must accord due weight.

**E.  Substantive Requirements of the IEP**

The heart of this dispute involves the appropriateness of Owen's IEPs, an area where there is little guidance. Although both sides to this dispute agree that Owen Johnson is a handicapped child under the definition of 20 U.S.C.A. § 1400 *et seq.* and that, as such, he is entitled to a "free appropriate public education," they disagree on whether Owen has received and is currently receiving meaningful educational benefit from his schooling.

*Rowley* requires this court to determine whether the IEP developed for Owen pursuant to the EHA is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3051.[9] Some of the benefits mandated by *Rowley* include free educational

services tailored to the unique needs of the particular handicapped child, an educational program which is "appropriate to [the child's] learning capacities," instruction which approximates the grade levels used in the state's regular education for non-handicapped children, auxiliary services which are necessary to permit the child to "benefit" from this education, and instruction designed to comport with the child's IEP. 458 U.S. at 189, 193 n. 15, 102 S.Ct. at 3042, 3044 n. 15. Additionally, to the maximum extent appropriate, the school district must educate handicapped children with children who are not handicapped. 458 U.S. at 202, 102 S.Ct. at 3049; 20 U.S.C. § 1412(5).

Our Court of Appeals has elaborated on the benefits a handicapped child is entitled to receive by stating that the educational benefit required by *Rowley* must be meaningful. *Polk v. Central Susquehanna Intermediate Unit*, 853 F.2d 171, 184 (3d Cir.1988). Nevertheless, *Rowley* and *Polk* do not and never intended to provide detailed requirements for the contents of IEPs. The *Rowley* Court stated, "[w]e do not attempt today to establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act." 458 U.S. at 202, 102 S.Ct. at 3049. In *Polk* Judge Becker stressed that, "indeed, *Rowley* was an avowedly narrow opinion that relied significantly on the fact that Amy Rowley progressed successfully from grade to grade in a 'mainstreamed' classroom. The Court self-consciously limited its opinion to the facts before it." *Polk*, 853 F.2d at 180.

■ The *Rowley* Court's vagueness is necessary, because the purpose of the EHA is to provide an appropriate education tailored to the individual needs of every child. Because the needs of every handicapped child are different, there can never be more

---

9. *Rowley* involved a deaf student who was receiving three hours of speech therapy a week and was making above-average academic progress in a mainstream kindergarten class. The child was advancing grade to grade along with hearing children. Moreover, the school had made extensive efforts to accommodate her needs. The child's parents, however, wanted a sign-language interpreter in the classroom, which the school unit opposed as unnecessary. In denying the parents relief the Court emphasized that the Act did not mandate that handicapped children receive an education that maximizes their potential. 458 U.S. at 200, 102 S.Ct. at 3047–48.

than general guidelines applicable to broad classes of handicapped students.[10] Every school must consider the individual needs of every handicapped student and design an IEP appropriate for that child. The task of courts is to ensure that this individual calibration is made.

Congress justified this elaborate and time consuming statutory framework on the theory that "... the expensive individualized assistance early in life, geared toward teaching basic life skills and self-sufficiency, eventually redounds to the benefit of the public fisc as these children grow to become productive citizens." *Polk*, 853 F.2d at 181–82. As our Court of Appeals explained:

> The EHA's sponsors stressed the importance of teaching skills that would foster personal independence for two reasons. First, they advocated dignity for handicapped children. Second, they stressed the long-term financial savings of early education and assistance for handicapped children.

*Polk*, 853 F.2d at 181.

### F. Meaningful Educational Progress

■ The ultimate question before this court is whether Owen has received and is currently receiving an educational program from the IU sufficient for him to make meaningful educational progress. *Polk*, 853 F.2d at 184. To determine whether Owen has made meaningful educational progress under the IU program, I must look at how much improvement Owen has made in light of his unique conditions.

Some of Owen's conditions include a late diagnosis of hearing loss, residual hearing memory from his first ten months of life, being the only deaf person in his family, above average intelligence, a strong voice, and a high level of stimulability for sound. Although Owen's speech deficiencies are

due in large part to the lateness of his diagnosis of hearing loss, the fact that Owen got a late start on his speech development calls for more intensive therapy to bring him up to speed. Similarly, Owen's residual hearing, strong voice, intelligence, and stimulability are all characteristics which make him more likely to have intelligible, spontaneous speech than a congenitally deaf child.

Under the total communication method, Owen's meaningful progress requires the development of both oral and manual communication. Owen has made excellent non-verbal progress, but he still lags behind other hearing-impaired children in his age group in language and communication skills despite his private therapy. Particularly disturbing is the unintelligibility of Owen's speech and his inability to produce a significant amount of spontaneous speech. The IU's emphasis on Owen's progress in academics and "language," generalizes Owen's progress in language and ignores his deficiencies in intelligible speech and oral communication. Ms. Knarr and Ms. Martin highlight Owen's progress in sound production, but that progress is not generalized and does not enable Owen to communicate orally with the hearing world.

As of December 15, 1990, when Owen was last given a comprehensive evaluation, Dr. Knast reported that Owen still ranks "low or moderately low compared to normal hearing age peers and even below average compared to other hearing-impaired children." Report of Dr. Knast, Plaintiffs' Exhibit 9 at 2. Dr. Knast summed up Owen's speaking ability by concluding: "... his speech is still weak with only some words being intelligible and he can only lipread (speechread) his name and some

---

**10.** It was for these reasons that the *Polk* opinion was careful to distinguish the plaintiff in *Rowley* from the plaintiff before them, noting:

> ... *Rowley* is distinguishable from the case *sub judice* because of the type of services requested. Unlike the services of a full-time interpreter (which arguably may be deemed extraordinary assistance), physical therapy

... is an integral part of what Congress intended by 'appropriate education' as defined in EHA, and it is an essential part of Christopher's education.... Finally, because of the severity of Christopher's disabilities and their qualitative difference from those of Amy Rowley, it is difficult to apply *Rowley* here. 853 F.2d at 182.

other simple, common words." *Id.*[11]

Owen is not in a mainstream classroom because of these deficiencies, yet under *Rowley* mainstreaming is one indication of whether a handicapped child is receiving adequate benefits from his or her education. Moreover, although Owen's academic progress so far has been almost equal to that of his hearing peers, Ms. Giovannitti suggested that if his language and communication skills do not improve at an increased rate, he will fall behind his hearing peers academically.

In fact, Owen has made meaningful progress in speech since February 1990; however, the question before this court is whether that progress resulted from the IU's therapy program. The plaintiffs contend that absent the private therapy Owen has received at their expense, Owen would not be making meaningful progress in school. The defendants, on the other hand, contend that even without the private therapy Owen would have made and is making meaningful progress in speech. The problem with determining whether Owen's IEP was and is appropriate is that it is impossible to separate the private therapy from the IU's therapy in order to determine how much progress each has helped Owen to make. The experts at trial testified that the private and IU therapy were inextricably intertwined, and they could not quantify the effect of either in isolation.

However, the plaintiffs presented evidence at trial that in the absence of private therapy Owen's speech and language ability regressed in several important respects.[12] From June 1989 to February 1990 the Johnsons halted Owen's private therapy. Mrs. Johnson testified that during that time period Owen's speech intelligibility regressed. For example, Owen's

ability to pronounce the word "later" regressed from "lador" to "wayor." Distressed at his regression, the Johnsons resumed private therapy, even though their lawyer advised them that doing so would make it more difficult to win the case against the IU and even though the sessions were a financial burden. The defendants did not challenge Mrs. Johnson's testimony on cross-examination.

Mrs. Johnson's observations correlated with the findings of the plaintiffs' experts. Dr. Knast, whom I found to be the most qualified expert presented by either side at trial, testified that Owen's progress during the period the Fuehrer sessions were halted was not meaningful. Specifically, Dr. Knast and Ms. Giovannitti noted that although Owen's sound production in therapy sessions showed some improvement during the break in private therapy, there was no improvement in the intelligibility of his speech, nor in his ability to make spontaneous speech. By contrast, Dr. Knast testified that Owen has made meaningful progress since the Fuehrer lessons were restarted in 1990, showing sixteen months of progress from February 1990 to December 15, 1990, versus two months of progress from February 1989 to February 1990.

The fact that Owen regressed when his private therapy halted is sufficient evidence that the IU was not providing him with a meaningful education. In an earlier case that formed part of the basis for its decision in *Polk*, the Court of Appeals held that "... a child who is regressing (and whose regression can be reversed by reasonable means) is not receiving sufficient 'benefit' under the Act...." *Polk*, 853 F.2d at 184 (citing *Board of Education v.*

---

**11.** At trial the defendants criticized Dr. Knast's tests, because they were based in part on anectdotal evidence supplied by the Johnsons. HT at 171–72. The defendants' expert, Mr. Miklos, testified that his results were based upon his observations of Owen in the classroom, a form of testing which he considered superior. HTII at 130. This court is not prepared to identify which form of testing is superior; it does note, however, that Dr. Knast was the only witness with a Ph.D. and that he expressed full confidence in his testing methodology. Moreover,

Mr. Miklos admitted that his tests relied in part on the observations of Owen's classroom behavior as reported by his classroom teacher. HTII at 127.

**12.** At the time the hearing officer and the Secretary reviewed the plaintiffs' case, there was no evidence that without the private therapy Owen would regress. By contrast, there is such evidence before this Court.

*Diamond,* 808 F.2d 987 (3d Cir.1986)). The *Polk* court expanded *Diamond*'s holding that educational benefit under the EHA must be meaningful by saying that it was not limited to cases of regression. *Id.*

This case is troubling and perplexing in that it lies between the extremes of *Polk* and *Rowley.* In *Polk* the child involved was so far behind his chronological peers that he had no realistic chance of ever advancing through school with them. In *Rowley,* by contrast, the child was able to keep pace academically with her peers in a mainstream classroom, albeit with three hours of speech therapy a week. Based on Owen's excellent potential for speech, the fact that he has not reached that potential, his regression when his private therapy stopped, and his minimal progress in spontaneous and intelligible speech from February 1989 to February 1990, I hold that the IU did not provide him with an appropriate education as required by the EHA.

My factual findings are based in large part on the weight and credibility I attach to the plaintiffs' expert and non-expert witnesses versus the defendants' expert witnesses. Both Judith Giovannitti and Dr. Jerome Knast testified that Owen did not have the speech and language skills that a child with his intelligence and residual hearing ability should have at his age and that he needed three-five sessions of speech therapy a week to make meaningful progress. Neither of these expert witnesses had anything to gain from their testimony; in fact, Patricia Fuehrer stands to lose one of her regular patients if her recommendations are accepted by this court. Similarly, this court found Mrs. Johnson to be a highly credible witness, in part, because she paid for Owen's private therapy.

By contrast, the defendants' witnesses, although all competent and acting in good faith, were not independent. Each of the defense's witness was connected to the IU and responsible either for designing, supervising, or implementing his IEP. To some degree those witnesses were defending their own professional performance and thus cannot be considered as impartial as Dr. Knast and Ms. Giovannitti.

## G. An Individualized IEP

■ Before I can determine what improvements are needed to provide Owen with an educational program that will enable him to make meaningful progress, I need to determine why the IU has failed Owen. Owen's IEPs are not, and have not been, sufficiently tailored to his individual needs. The Court of Appeals held in *Polk* that an IEP must be "... defined by an *individualized* program that confers benefit." *Polk,* 853 F.2d at 179 (emphasis in original). The IU has done a good job of creating a curriculum for the hearing-impaired, but it has not tailored that curriculum to Owen's individual needs. Dr. Knast and Ms. Giovannitti testified that the fact that Owen had hearing for the first ten to twelve months of his life determines, in part, the amount and type of therapy he needs. Yet, the IU admitted at trial that it has never varied the amount of speech and language therapy a student receives to take into account whether or not the student is congenitally deaf. In addition, the IU has made no special provision to take into account the late diagnosis of deafness that Owen received, a condition which Ms. Giovannitti testified would normally mandate a more intensive speech and language program.

## H. Remedies for Speech and Language Therapy

■ In deciding what relief is appropriate, this court walks a fine line between § 1415(e)(2)'s broad provision that district courts award "such relief as the court determines is appropriate" and the dictates of *Rowley* that courts not intrude upon the professional judgment of educators. However, although the *Rowley* opinion stressed that the Act was not an invitation for courts to interfere in the decisions of school officials, it did not abdicate responsibility for monitoring the substantive quality of education under the EHA. 458 U.S. at 192, 102 S.Ct. at 3043–44. As our Court of Appeals stated,

... we do not read the Supreme Court's salutary warnings against interference with educational methodology as an invitation to abdicate our obligation to enforce the statutory provisions that ensure a free and appropriate education....

*Polk*, 853 F.2d at 184.

Like Judge Becker, this court does not read *Rowley* to mean that it should accept the IU's opinion out of blind deference to their expertise in special education. This is especially so where the IU's opinion contradicts that of the hearing officer, Dr. Cibik. It is significant that the hearing officer also concluded that Owen needed more speech and language therapy to make meaningful progress. The hearing officer, like myself, heard the full panoply of witnesses and evidence at trial, whereas the Secretary did not.[13] Finally, Dr. Cibik is himself an education expert, and thus his findings carry more weight than that of a non-expert.

Although both sides agree that the total communication approach is most appropriate for Owen, the plaintiffs and the IU hold differing views on the interrelationship between speech and language therapy.[14] The IU program segregates speech and language therapy and places the responsibility for language therapy exclusively on the classroom teacher, who, this year, is not a speech and language pathologist. The plaintiffs believe that speech and language therapy should be given to Owen in the same sessions by a speech and language pathologist, as is done in private therapy with Ms. Fuehrer. Additionally, the plaintiffs want two additional 30–minute sessions a week on different days; whereas, the IU believes extra therapy can be given by lengthening the therapy sessions. Finally, the plaintiffs ask that the language therapy be done by a speech and language pathologist, as opposed to a teacher of the hearing-impaired. In contrast, the IU does not believe a language pathologist is necessary for Owen's language development.

Dr. Cibik's decision ordered the IU to follow Dr. Knast's and Ms. Giovannitti's recommendations for extra therapy. I do likewise, in part, ordering that the IU provide Owen with two additional 30–minute sessions of speech and language therapy, either individually or in a group of no more than two pupils. The IU must conduct these additional sessions outside the classroom. Moreover, the plaintiffs shall be reimbursed for the past Fuehrer lessons during the 1989–90 school year (totalling $1,745.00). However, I will not grant the plaintiffs' request that a speech and language pathologist administer Owen's additional speech and language therapy, because that would involve excessive interference by this court with the IU's professional judgment. Rather, the IU shall determine who shall provide additional therapy to Owen.

Additionally, I order that the IU provide Owen's extra therapy during his school day to prevent exhaustion. Witnesses for both sides agreed that Owen is tired at the end of the day and would benefit more from therapy during the school day rather than after school. Owen already has a twenty-minute period of time near the end of each school day in which he plays while waiting to be picked up. Although this court will allow the IU to schedule the extra session as it deems appropriate, the court notes that there is time in Owen's school day for extra therapy on Tuesdays, Thursdays, and Fridays, because Owen receives IU therapy on Mondays and Wednesdays.

I.  Adult Role Model

The second issue regarding the substance of Owen's IEP is the request that a hearing-impaired adult spend one to one and a half hours per week in Owen's classroom to serve as a role model. The plaintiffs' expert witness, Angela Bednarczyk, testified that role models for the hearing-impaired were crucial to developing self-esteem in hearing-impaired children. The plaintiffs also argued that the opportuni-

---

**13.** It is interesting to note that in *Rowley* the district court ruled against the findings of the hearing officer.

**14.** "Language" includes all communication, including both oral and manual expression.

ties for Owen to interact with hearing-impaired adults were limited, because no one else in his family is hearing-impaired.

The defendants' witnesses, however, argued that the majority of hearing-impaired adults utilize a different sign language, American Sign Language ("ASL"), than the Exact Signed English taught to the children in IU–13. Owen's teachers testified that the presence of a hearing-impaired adult using only ASL would confuse the children and undermine the teacher's efforts to teach them Exact Signed English. Moreover, the IU–13 allows for adult role models for the hearing-impaired starting in junior high and continuing through high school. Also, starting in junior high, hearing-impaired children learn ASL, in addition to Signed English. The defendants' experts explained that the value of a role model does not become acute until children reach junior high age.

Finally, it is undisputed that the Lancaster area has a large adult deaf population, that there at least three organizations that provide opportunities for Owen to interact with hearing-impaired adults, and that Owen has, in fact, been attending one of these organizations, the First Deaf Mennonite Church, once a month in order to interact with deaf adults. Given the abundance of opportunities for Owen to interact with hearing-impaired adults outside of the classroom, the sound arguments made by the IU–13 for not having a hearing-impaired adult in the classroom until junior high, and the fact that the IU–13 will eventually allow Owen to have a hearing-impaired adult role model once he enters junior high, I do not find that the lack of a hearing-impaired adult role model in Owen's classroom deprives him of a meaningful education.

### J. The Extended School Year Program

Finally, the plaintiffs ask that Owen be admitted into the IU's Extended School Year program in order to prevent regression during the summers. Officials of the IU's ESY committee rejected Owen's admission into the program, not because he did not regress, but because he recouped the losses from the summer recess rather quickly. The IU, however, refused to consider the opinions of experts from outside the IU, namely Dr. Knast and Ms. Giovannitti, both of whom recommended Owen's placement in the ESY program. The hearing officer held that the IU must consider the views of outside experts in determining Owen's qualification for the ESY program. Little was said about the issue at trial, but based upon the administrative record, I affirm the hearing officer's decision.

### III. CONCLUSIONS OF LAW

1. This court has subject matter jurisdiction over the controversy pursuant to § 615(e)(2) of the EHA.

2. Owen Johnson's 1989–1990 and 1990–1991 IEPs did not and do not provide him with a free appropriate public education within the guidelines of the EHA.

3. To receive an appropriate education under the EHA Owen Johnson shall receive four weekly 30–minute sessions of speech therapy.

4. The IU–13 shall reimburse the Johnsons for past expenses for private speech therapy totalling $1,745.00.

5. A hearing-impaired adult is not required in the classroom in order for Owen Johnson to receive a meaningful benefit from his education.

6. The two-tier level of review provided by the Commonwealth of Pennsylvania when the plaintiffs appealed Owen's IEP violated the EHA.

7. The IU shall consider the opinions of outside experts when determining Owen's admission into the ESY program.

An order follows.

### ORDER

AND NOW, upon consideration of the administrative record, the Stipulation of Facts, and the testimony and arguments at the January 3–4, 1991 trial, IT IS ORDERED:

1. The defendants Lancaster–Lebanon Intermediate Unit 13 and Lancaster City School District shall reimburse the plain-

tiffs for $1,745.00, the cost of Owen's private therapy lessons during the past school years.

2. The defendant Lancaster–Lebanon Intermediate Unit 13 shall provide Owen Johnson with two additional thirty-minute sessions of language and speech therapy per week on different days, either individually or in groups of no more than two pupils. Owen shall receive a total of four therapy sessions per week on different days for 25–30 minutes, either individually or in groups of no more than two pupils.

3. The defendant Lancaster–Lebanon Intermediate Unit 13 shall consider the decisions of non-IU experts when deciding whether to place Owen in the Extended School Year program.

4. The Secretary of Education's decision in this case is vacated, and this Court's opinion and order supersedes all other decisions in this matter.

5. The case against Donald M. Carroll, Jr., the Secretary of Education, is DISMISSED without prejudice.