950 F.2d 128
 71 Ed. Law Rep. 621
 Shannon W. WHEELER, a Minor, by Her Parents and Natural
Guardians, Joseph WHEELER and Susan Wheeler, His Wife;
Joseph Wheeler and Susan Wheeler, in Their Own Right and
Parents and Natural Guardians of Shannon Wheeler, a Minor, Appellants,
v.
TOWANDA AREA SCHOOL DISTRICT.
 No. 91-5417.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 12, 1991.
Decided Dec. 5, 1991.
Rehearing and Rehearing In Banc Denied Jan. 3, 1992.
 
 Antoinette Szarek (argued), Philadelphia, Pa., for appellants.
 Michael I. Levin, (argued), Cleckner and Fearen, Abington, Pa., for appellee.
 Before MANSMANN, NYGAARD, and SEITZ, Circuit Judges.
 
 OPINION OF THE COURT
 NYGAARD, Circuit Judge
 
 1
 Plaintiffs-appellants, Shannon W. Wheeler and her parents, appeal a summary judgment denying their motion for attorney's fees from defendant-appellee Towanda Area School District under the fee-shifting provisions of the Education of the Handicapped Act ("EHA"), 20 U.S.C. § 1415. Those provisions award reasonable attorney's fees to a prevailing party. We exercise plenary review of the District Court's summary judgment in favor of the School District. Erie Telecommunications, Inc. v. City of Erie, 853 F.2d 1084, 1093 (3d Cir.1988). The district court concluded that appellants were not prevailing parties. We will affirm.
 
 I.
 
 2
 Shannon is a hearing impaired high school student. Because she is deaf, the School District created an Individualized Education Plan which required a sign language interpreter. Terri Kane was Shannon's sign language interpreter for the 1989-1990 school year. Convinced that Kane's interpreting skills were inadequate, Shannon's parents initiated special education due process proceedings against the School District. Although their initial request did not specifically assert that Kane was not qualified, it is clear that such was the thrust of their request. Eight due process hearings followed, running from February to April 1990.
 
 
 3
 A. The Due Process Hearings.
 
 
 4
 The Pennsylvania Department of Education Hearing Officer presided over the due process hearings. The Parents asked the hearing officer to adopt the following conclusions of law:
 
 
 5
 4. ... Shannon has been denied an equal opportunity to gain the same benefit or level of achievement as a nonhandicapped person solely because of her deafness by reason of the district hiring an unqualified interpreter.
 
 
 6
 5. The district has violated Section 504 in that it did not provide related qualified interpreter services to Shannon, which are designed to meet her needs as adequately as the needs of the unhandicapped persons are met.
 
 
 7
 6. Section 300.12 of the EHA regulations defines "qualified" for those persons providing special education or related services as follows:
 
 
 8
 As used in this part, the term "qualified" means the person has met state educational agency approved or recognized certification, licensing, registration, or other comparable requirements which apply to the area in which he or she is providing special education or related services.
 
 
 9
 7. Since the Pennsylvania Department of Education (PDE) district has no certification or licensing requirements, interpreters in an educational setting must meet other comparable requirements established by the Registry of Interpreters for the Deaf. (RID).
 
 
 10
 8. The district has violated above-quoted Section 300.12 since the District has failed to provide an interpreter which meets this section's definition of "qualified".
 
 
 11
 9. By providing an interpreter who was not qualified as defined by above-quoted Section 300.12, the District has violated the Rowley and Diamond standard in that the interpreter which the district has provided resulted in Shannon's educational regression rather than making progress.
 
 
 12
 Wheeler v. Towanda Area Sch. Dist., No. 90-1764, slip op. at 11-12 (M.D.Pa. May 10, 1991).
 
 
 13
 Kane testified at the hearings that she had some difficulty interpreting for Shannon, was not at Shannon's level of signing, and was uncomfortable interpreting for Shannon. Kane became ill and in late February, 1990 orally requested a transfer. Upon receiving notice from Kane, the School District immediately began searching for a new interpreter with the aid of outside experts. After March 16, 1990, she no longer acted as Shannon's interpreter.
 
 
 14
 The hearing officer rejected the Parents' claim that Shannon's poor performance was due solely to the interpreter. He found that many other factors led to her poor performance, such as poor attendance and low motivation. Moreover, he found that Shannon did not do significantly better in school with other interpreters. Thus, the hearing officer found it impossible to say whether Kane was responsible for Shannon's difficulties. He also did not address the issue of whether the School District violated EHA Section 300.12 or Section 504. Furthermore, the hearing officer did not adopt any of the Parents' proposed conclusions of law.
 
 Instead, he issued the following order:
 
 15
 It is hereby ordered that ... the District make all concerted effort to advertise and hire a suitable interpreter for Shannon looking into all possible options for providing an equally appropriate salary scale given the possible latitude under the School Code.
 
 
 16
 Decision of the Hearing Officer, issued Apr. 19, 1990, at 7.
 
 
 17
 B. The Secretary of Education.
 
 
 18
 Dissatisfied with the hearing officer's findings, the Parents appealed to the Pennsylvania Secretary of Education.[1] They filed many exceptions to the hearing officer's decision, including a request that the School District be required to provide an interpreter qualified under Section 300.12 of the EHA regulations. An interpreter acceptable to the Parents would have to meet one of the following criteria, based on Section 300.12:
 
 
 19
 1. An interpreter certified by the Registry of the Interpreters of the Deaf (RID);
 
 
 20
 2. An interpreter who is graduated from Bloomsberg University or any other four-year degree interpreter training program;3. An interpreter who is graduated from a two-year interpreter program and who has had at least four years experience interpreting on the high school level under the supervision of a senior interpreter;
 
 
 21
 4. An interpreter with no degree or certification who passes an evaluation conducted by Donna Pocobello or Betty Colonomos or other individual with comparable credentials.
 
 
 22
 Dist.Ct. op. at 13.
 
 
 23
 The Secretary rejected Section 300.12 as irrelevant. In rejecting the Parents' proposed qualifications, he explained in his opinion:
 
 
 24
 We do not herein advocate any specific certification credentials as indicating an individual can act as a "qualified" interpreter. Nor need we do so; in this case, we do not deal with credentials in general or students in general, but rather with one specific student.
 
 
 25
 Special Ed. Opinion No. 407, In re the Educational Assignment of Shannon W., issued July 3, 1990, at 4.
 
 
 26
 The Secretary also declined to pass judgment on Kane's qualifications, stating:
 
 
 27
 We stress that this opinion offers no statement as to Ms. Kane's overall ability as an interpreter. The hearing officer noted that testimony from sign language experts "speaks to the lack of proficiency" on the part of Ms. Kane. While she may not yet possess the skills to interpret at the high school level, an expert evaluation may deem her a qualified interpreter for another hearing impaired student in the District.
 
 
 28
 Id. at 7-8.
 
 
 29
 Recognizing the sharp disagreement over the selection of a new interpreter, the Secretary acknowledged that a third party would help mediate the dispute. Consequently, he issued an order modifying the hearing officer's order to require that the School District make a "conscious effort" with the aid of an outside expert to hire an interpreter who could "accurately transmit information to and from her in her specific academic setting." He denied all exceptions not pertaining to that issue.
 
 
 30
 Thus, the only change the Secretary made in the hearing officer's decision was to call for the use of an outside expert to assist the board in locating a new interpreter. The Parents' other claims were rejected.
 
 II.
 
 31
 The only issue in this appeal is the Parents' claim that they are entitled to attorney's fees under the fee-shifting provisions of the EHA. The EHA, as modified by the Handicapped Children's Protection Act of 1986, states in relevant part,
 
 
 32
 (B) In any action or proceeding brought under this subsection, the court, in its discretion, may award reasonable attorney's fees as part of the costs to the parents or guardian of a handicapped child or youth who is the prevailing party.
 
 
 33
 20 U.S.C. § 1415(e)(4)(B).
 
 
 34
 The standard for determining whether a party has prevailed is well settled. A prevailing party must succeed on "any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Hensley v. Eckerhart, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (quoting Nadeau v. Helgemoe, 581 F.2d 275, 278-79 (1st Cir.1978)). We apply a two-part test consistent with the Hensley guideline: whether plaintiffs achieved relief and whether there is a causal connection between the litigation and the relief from the defendant. Institutionalized Juveniles v. Secretary of Pub. Welfare, 758 F.2d 897, 910 (3d Cir.1985).
 
 
 35
 The first-prong of the test is whether the Parents achieved relief on any of their claims. This involves a commonsense comparison between the relief sought and obtained. 758 F.2d at 911. We have previously articulated a liberal standard for that comparison: as long as a plaintiff achieves some of the benefit sought in a lawsuit, even though the plaintiff does not ultimately succeed in securing a favorable judgment, the plaintiff can be considered the prevailing party for purposes of a fee award. NAACP v. Wilmington Medical Ctr., Inc., 689 F.2d 1161, 1166 (3d Cir.1982), cert. denied, 460 U.S. 1052, 103 S.Ct. 1499, 75 L.Ed.2d 930 (1983).
 
 
 36
 Although Shannon now has a different interpreter, the Parents did not prevail on any of their legal claims. The Parents' proposed legal conclusions made two claims: they asked for a finding that Shannon's interpreter was not qualified and that the School District thus violated EHA sections 300.12 and 504.
 
 
 37
 Neither the Secretary nor the hearing officer found that Kane was not qualified--the first issue tendered by the parents. Only if the parents proved that Kane was not qualified would her employment be illegal under section 300.12. Since they did not do so, their due process claim that Kane was not qualified must fail.
 
 
 38
 The Secretary also rejected the Parents' second request. They asked the Secretary to apply the standardized qualifications of EHA sections 300.12 and 504. He found them to be irrelevant to Shannon's case. His order required only that the new interpreter be able to transmit information to and from Shannon specifically.
 
 
 39
 Nonetheless, since a new interpreter was some of the benefit the Parents sought in bringing suit, we must now apply the second prong of the test, namely causation. Litigation is causally related to the relief obtained if it was a material contributing factor in bringing about the events that resulted in obtaining the desired relief. Institutionalized Juveniles, 758 F.2d at 916. Litigation can be a material contributing factor if it changed the legal relations of the parties such that defendants were legally compelled to grant relief. See, e.g., Texas State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (vindication of teachers' First Amendment rights caused school district to stop interfering with teacher union communications).
 
 
 40
 Alternatively, causation can be established through a "catalyst" theory, where even though the litigation did not result in a favorable judgment, the pressure of the lawsuit was a material contributing factor in bringing about extrajudicial relief. See, e.g., Institutionalized Juveniles, 758 F.2d at 917 (litigation was catalyst to legislative reform for institutions); Sullivan v. Pennsylvania Dep't of Labor & Indus., 663 F.2d 443 (3d Cir.1981) (EEOC complaint caused union to take case to arbitration, where relief was ultimately granted). Under either approach, a plaintiff's action need not be the sole cause of relief. Where there are multiple causes, as long as the litigation was a material contributing factor, it is sufficient to establish causation. NAACP, 689 F.2d at 1169.
 
 
 41
 The Parents have not shown a causal connection under either theory between their lawsuit and the hiring of a new interpreter. The Parents contend that the School District was forced to change its hiring policies. We find this contention to be without merit. Neither the hearing officer nor the Secretary ordered the School District to do anything that they were not already doing. The hearing officer required the district to make an effort to advertise and hire a suitable interpreter. The Secretary's final order also instructed the School District to advertise to hire an effective interpreter but with the aid of an outside expert. In fact, the district was searching for a new interpreter and already consulting with an outside expert before the hearing officer's decision and months before the Secretary's final order. Thus, the uncontradicted affidavit by Betty Cox, Superintendent of the Towanda Area School District, recites:
 
 
 42
 The School District made a conscious effort since late February, 1990, to find [an] interpreter as evidenced in paragraph 8 hereof and the School District solicited and/or received the aid of various kinds of experts, such as Barbara Davis, Gary McKutch, Donna Pocobello, James Tucker, Roger Hayden, and Loren Bower, all as more fully described in the preceding paragraphs hereof. The School District's efforts remain[ed] essentially constant....
 
 
 43
 Affidavit of Betty Cox, at 7. Since the quoted material would have been admissible at trial, it is basically conclusive on the causation issue because the district court was deciding a summary judgment motion. Fed.R.Civ.P. 56(e).
 
 
 44
 The parents argue, however, that before the Secretary's decision the district used experts only in order to locate interpreters. In his opinion, the Secretary stated:
 
 
 45
 [I]n light of the level of disagreement in this case thus far, consulting with an outside expert, thoroughly trained in sign language and educational interpreting, is an essential component to evaluating a prospective interpreter for Shannon. Consultation and evaluation must take place before an individual is permanently designated as her interpreter.
 
 
 46
 Special Ed. Opinion No. 407, at 5. The parents contend that this language forced the school district to begin using outside experts to evaluate interpreters rather than to locate candidates for the position. In our view, the quoted language mandates the use of an expert for the district's evaluation process. The opinion does not delegate sole authority to evaluate potential employees to outside experts.
 
 
 47
 Although the district did ask a different outside expert to evaluate candidates after the Secretary's decision, contrary to the parents' assertions, they did so because the person who had conducted the evaluations was no longer available. Affidavit of Betty Cox, at 7-8. Thus, the most that can be said is that the Parents have established a sequence of events. They have failed to establish an adequate record basis for anything more. We therefore conclude that the hearing officer's decision and the Secretary's order precipitated no change at all.
 
 
 48
 Accordingly, because the School District's behavior remained constant at all times towards the Parents, and because the Parents failed to submit contrary evidence to the district court, we find no reversible error. The Parents' action did not contribute materially to any benefit ultimately conferred upon Shannon.
 
 III.
 
 49
 In summary, the Parents did not prevail over the school district. Their legal claims were repeatedly rejected, and their action was responsible for no cognizable measure of relief. For the foregoing reasons, we will affirm the judgment of the district court.
 
 
 50
 MANSMANN, Circuit Judge, dissenting.
 
 
 51
 Because I believe that the majority has adopted an unduly narrow view of the facts of this case and has, as a result, misconstrued the thrust of the opinions issued in the Wheeler administrative proceedings, I strongly dissent. If the Wheelers are not here entitled to recover the large amount of attorneys' fees incurred in securing a competent interpreter for their hearing-impaired daughter, it is difficult to imagine any case in which parents, battling the powers that be in the educational setting, could hope to be successful with respect to a fee award.
 
 I.
 
 52
 In evaluating this case, it is critical to bear in mind the history of and purpose underlying the fee shifting provisions of the statutory scheme at issue. In 1975, Congress enacted legislation known as the Education of the Handicapped Act. This Act allocated federal funds to state educational programs provided that the state had formulated a "policy that assures all handicapped children the right to a free appropriate public education," 20 U.S.C. § 1412(1) (1988). The Act also "required that states install 'procedural safeguards' to ensure that handicapped children and their parents or guardians may effectively oppose institutional decisions affecting educational opportunity. Id. § 1415(a)." Angela L. v. Pasadena Independent School District, 918 F.2d 1188, 1192 (5th Cir.1990).
 
 
 53
 Originally, the Act did not include a provision permitting recovery of attorneys' fees and the Supreme Court held in Smith v. Robinson, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), that in the absence of an express statutory provision to the contrary, attorneys' fees were not recoverable under the Act. As a result, "[P]arents of handicapped children, often already burdened by the prohibitive costs of medical care and equipment, found it difficult to pursue expensive litigation against school districts." Pasadena Independent School District, 918 F.2d at 1192. The situation changed, however, in 1986:
 
 
 54
 Congress sharply criticized the Court's decision in Smith and acted "swiftly, decisively, and with uncharacteristic clarity to correct what it viewed as a judicial misinterpretation of its intent." In the Handicapped Children's Protection Act of 1986, ... Congress amended the EHA to permit the recovery of attorney's fees.... Congressional officials asserted that the legislation represented a critical tool in parents' attempts to secure an appropriate education for their handicapped children.
 
 
 55
 Id. at 1192-93 (citations omitted).
 
 
 56
 It is undisputed that the provision for attorneys fees in appropriate cases enabled parents to challenge, on behalf of their children, educational practices and policies which might otherwise have gone unremedied. I believe that the majority's analysis of the outcome of the Wheeler administrative proceedings eviscerates the intent of the fee-shifting provision and will almost certainly deter future legitimate challenges to school districts' practices and policies. What has always been an uphill battle now becomes all but impossible.
 
 II.
 
 57
 Because my differences with the majority in this matter are, in part, fact-based, it is important to amplify and clarify the chronology of events preceding this appeal.
 
 
 58
 In the Fall of 1989, Shannon Wheeler was a profoundly deaf eleventh grader attending Towanda Senior High School in Towanda, Pennsylvania. Because of Shannon's hearing impairment, the School District was required to and did develop for Shannon an Individual Education Plan (IEP). This IEP provided that Shannon, who was mainstreamed in regular classes, would be provided with an interpreter in order to permit her equal access to educational benefits and programs.
 
 
 59
 Prior to the fall of 1989, Shannon had been paired with an interpreter with a degree in sign language interpretation. In the fall of 1989, the School District hired a new superintendent of schools, Dr. Betty Cox. As appears often to be the case when budgetary cuts must be made, the new superintendent, in an effort to reduce costs, turned to the area of special education. The record establishes that Cox, relying on budgetary grounds, sought to reduce the salary being paid to Shannon's interpreter, Ms. Perks, advising Ms. Perks that if she were to continue interpreting for Shannon her salary would be reduced from that of a professional employee to that of a classroom aide--a reduction in Ms. Perks' salary of roughly half. Faced with this reduction in pay, Ms. Perks resigned. Subsequent to Perks' resignation, Superintendent Cox transferred Ms. Terri Kane, a classroom aide, from a kindergarten class and assigned her to interpret for Shannon at the high school level. Kane had worked interpreting in the kindergarten setting for only two months and had, in the three years prior to her work as a kindergarten aide, been employed as a veterinary assistant.
 
 
 60
 The Wheelers were dissatisfied with Kane's performance as an interpreter almost immediately and, on September 13, 1989, they requested that a special education due process proceeding be initiated in order to secure a qualified interpreter for their daughter. The due process proceeding was scheduled to begin on November 20, 1989 but was delayed by the School District pending an evaluation of Ms. Kane's interpreting services. Donna Pocobello was retained by the School District to perform the evaluation. In a report dated December 2, 1989, Pocobello detailed the results of her evaluation of Ms. Kane, concluding that
 
 
 61
 [b]ased on the video tapes, my interaction with [Ms. Kane] and the student and observations during three classes, it is my opinion that this teacher aide/interpreter is not adequately providing interpreting services for this hearing-impaired student.
 
 
 62
 Because the Wheelers and the School District could not agree on the appropriate course of action to be taken following the outcome of Pocobello's evaluation, due process proceedings went forward. During the course of those proceedings, Ms. Kane resigned.
 
 
 63
 In an opinion dated April 19, 1990, the Pennsylvania Special Education Hearing Officer identified the issue to be decided as follows: "The point of disagreement is in the determination of the qualification of Shannon's interpreter." Decision of the Hearing Officer, at 3. The hearing officer's decision, which was not a model of clarity, then addressed the question of interpreter qualification, analyzing the requirements which should apply to any interpreter hired for Shannon:
 
 
 64
 The interpreter hired for Shannon should have a degree of proficiency or experience to enable him or her to feel comfortable in a High School academic setting. There is clearly a gradient of content between elementary, secondary, and post-secondary instructional settings. The present interpreter was working with a Kindergarten student for about two months and was a veterinary assistant for the prior three years. She did not feel that she was at the High School level and was not comfortable voicing for Shannon.
 
 
 65
 Id. at 6 (emphasis added). The decision culminated in an order specifying that
 
 
 66
 the District make all concerted effort to advertise and hire a suitable interpreter for Shannon looking into all possible options for providing an equally appropriate salary scale given the possible latitude under the School Code.
 
 
 67
 Id. at 7 (emphasis added).
 
 
 68
 This decision, framed as it was, caused both parties to claim victory in the administrative proceedings. The parents claimed that the decision with respect to the qualifications of Shannon's interpreter reflected a finding that Ms. Kane was not qualified to interpret at the high school level. In a letter to the Wheelers' counsel dated April 24, 1990, counsel for the School District claimed the opposite, stating that "the program at issue, with the interpreter provided (Kane) is appropriate."
 
 
 69
 Arguing that the real issue underlying the administrative proceedings had nothing to do with the appropriateness of Shannon's program, the Wheelers filed an appeal to the Pennsylvania Secretary of Education through a document captioned "Exceptions, Request for Clarification of Hearing Officer's Decision and Request for More Specific Order."
 
 
 70
 On July 3, 1990, the Secretary of Education issued an opinion addressing the issues raised by the Wheelers, concluding that "[W]hile exceptions and answers have been made regarding numerous aspects of the hearing below, ... this appeal essentially turns upon the acceptable interpretation of the word 'qualified'...." In re the Educational Assignment of Shannon W., Special Ed. Opinion No. 407, at 2. The Secretary then undertook "an examination of the functional role of the interpreter that has been promised by the District." Id. at 4. Assessing this role, the Secretary wrote:
 
 
 71
 We do not herein advocate any specific certification credentials as indicating an individual can act as a "qualified" interpreter. Nor need we do so; in this case, we do not deal with credentials in general or with students in general, but rather with one specific student. We hold instead that districts hiring interpreters to implement IEPs must make a conscious effort to provide what they have promised and find an individual who can accurately transmit information to the student in question. We further hold that, in light of the level of disagreement in this case thus far, consulting with an outside expert, thoroughly trained in sign language and educational interpreting, is an essential component to evaluating a prospective interpreter for Shannon. Consultation and evaluation must take place before an individual is permanently designated as her interpreter.
 
 
 72
 Id. at 4-5 (emphasis added). He also concluded that "a related service provided by a district must be of reasonable and reliable quality.... [A]n interpreter providing the related service of essential communication must be able to pass an evaluation separate from any assessment of progress which the student succeeds in making with the aid of that service." Id. at 5-6. The Secretary stressed the need for individualization in the selection of interpreters, indicating that someone able to sign with accuracy at the elementary level may not be qualified to sign in a high school setting. With respect to the qualifications of Ms. Kane in particular, the Secretary stated:
 
 
 73
 It is unclear whether or not the District has decided to transfer Teresa Kane to another student for the 1990-91 school year. We stress that this opinion offers no statement as to Ms. Kane's overall ability as an interpreter. The hearing officer noted that testimony from sign language experts "speaks to the lack of proficiency on the part of Ms. Kane." While she may not yet possess the skills to interpret at the high school level, an expert evaluation may deem her a qualified interpreter for another hearing impaired student in the district.
 
 
 74
 Id. at 7-8 (emphasis added). The Secretary then ordered "that the District make a conscious effort, with the aid of an outside expert, to hire an interpreter for Shannon W. who can accurately transmit information to and from her in her specific academic setting." Id. at 9.
 
 
 75
 Subsequent to this decision by the Secretary, the Wheelers filed suit in the United States District Court for the Middle District of Pennsylvania to recover under the EHA, attorneys fees and costs totalling, at that time, $98,496.18. In disposing of summary judgment motions filed by each party, the district court dismissed the Wheelers' claim for attorneys fees based upon its finding that the Wheelers had not prevailed in the administrative due process proceedings and were not, therefore, entitled to counsel fees.
 
 III.
 
 76
 Affirming the order of the district court, the majority articulates the standard for determining whether a party has prevailed for the purposes of a fee award. "We apply a two-part test ...: whether plaintiffs achieved relief and whether there is a causal connection between the litigation and the relief from the defendant. Institutionalized Juveniles v. Secretary of Pub. Welfare, 758 F.2d 897, 910 (3d Cir.1985)." Majority at 131. Whether the Wheelers won relief on any of their claims is to be determined by a "liberal" comparison between the relief sought and obtained. Id. at 131.
 
 
 77
 Evaluating the facts of this case against the stated legal standard, the majority concludes that the Wheelers cannot qualify as prevailing parties for purposes of an award of attorneys fees. The majority looks first to the hearing officer's opinion, stating that "[t]he hearing officer did not adopt any of the Parents' proposed conclusions of law." Majority at 130. In focusing upon the fact that the hearing officer did not adopt the exact language proposed by the Wheelers, the majority fails to consider the overall thrust of the hearing officer's opinion which concludes that Ms. Kane was not, in fact, qualified to interpret for Shannon and that budgetary constraints would need to be reevaluated by the School District in order to attract an effective replacement for Kane. As has been noted previously, with respect to Kane's qualifications, the hearing officer stated:
 
 
 78
 The interpreter for Shannon should have a degree of proficiency or experience to enable him or her to feel comfortable in a High School academic setting. There is clearly a gradient of content between elementary, secondary, and post-secondary instructional settings. [Ms. Kane] was working with a kindergarten student for about two months and was a veterinary assistant for the prior three years. She did not feel that she was at the High School level and was not comfortable voicing for Shannon.
 
 
 79
 Decision of the Hearing Officer, at 6 (citations omitted). The hearing officer also stated that "[T]estimony from the sign language experts speaks to the lack of proficiency on the part of the interpreter in question." Id. at 5 (citations omitted). These excerpts from the opinion establish that any interpreter hired for Shannon was required to have at least that proficiency which would enable him or her to "feel comfortable" and that Kane did not meet this standard.
 
 
 80
 The hearing officer also stressed the budgetary component involved in locating a replacement for Kane:
 
 
 81
 The success in finding an interpreter suitable for Shannon does seem to depend on the issue of compensation.... It does not seem reasonable to expect a positive reply from someone with training and/or experience to accept the position on an aide pay scale.
 
 
 82
 Id.
 
 
 83
 The hearing officer's order,[1] read in light of the preceding statements, clearly requires something of the School District which was not required prior to the initiation of administrative proceedings. First, the opinion and order establish that a given interpreter is not qualified to interpret for a particular student simply because the School District has pronounced him or her qualified. The interpreter must be proficient enough to "feel comfortable" in the assigned position. Second, the order required the School District to research budgetary options for increasing the pay scale available to interpreters.
 
 
 84
 While the hearing officer's opinion may not have granted the Wheelers all that they had hoped for, it did establish that Kane was not a suitable interpreter for Shannon and imposed constraints in locating a replacement interpreter that had not been in place before. The lack of a perfect match between what was asked for and what was received does not, in my view, compel the conclusion that the Wheelers did not prevail before the hearing officer.
 
 
 85
 I also differ with the majority's analysis of the relief granted by the Secretary of Education. The majority concludes that the Secretary's decision, like that of the hearing officer, failed to grant significant relief to the Wheelers in that the Secretary denied the Wheelers' request for a finding that Shannon's interpreter was not qualified. The majority's treatment of the Secretary's opinion ignores the practical import of the opinion as a whole and belies the liberal standard for assessing prevailing party status upon which the majority purports to rely.
 
 
 86
 In proceedings before the Secretary of Education, the Wheelers sought an order requiring that the School District modify Shannon's IEP to provide her with a qualified interpreter in accordance with Section 300.23 of the EHA regulations. The Wheelers also asked that the Secretary require the School District to advertise widely in order to hire an interpreter qualified under one of several stated standards which included the following:
 
 
 87
 (4) An interpreter with no degree or certification who passes an evaluation conducted by Donna Pocobello or Betty Colonomos or other individual with comparable credentials.
 
 
 88
 The majority concludes that the Wheelers did not receive what they asked for and that, under the terms of the Secretary's decision, the School District was permitted and continued to operate exactly as it had prior to that decision in securing an interpreter for Shannon. This simply is not the case.
 
 
 89
 I believe that any reasonable reading of the administrative opinions supports the conclusion that Shannon's interpreter, Ms. Kane, was indeed found to be unqualified to interpret for Shannon and that the qualification standard set forth above was adopted by the Secretary. The Wheelers maintain that their goal in the administrative litigation was to have the School District secure an interpreter who could pass an evaluation conducted by an individual with credentials comparable to that of their two sign language and educational interpreting experts. This is what the Secretary ordered. The Secretary specifically held that "[consultation] with an outside expert, thoroughly trained in sign language and educational interpreting is an essential component to evaluating a prospective interpreter for Shannon. Consultation and evaluation must take place before an individual is permanently designated as her interpreter." In re the Educational Assignment of Shannon W., at 5. The order issued by the Secretary specified that the hiring of an interpreter for Shannon "be done with the aid of an outside expert who can accurately transmit information to and from her in her specific academic setting." Id. at 9.
 
 
 90
 The parents' claim to have prevailed in this matter centers on the required introduction into the interpreter hiring process of an outside expert who is, by the terms of the Secretary's order, required to evaluate a prospective interpreter. "Without this safeguard, ... the Parents would be at the mercy of the Defendant which had no experts trained in sign language and educational interpreting, which had no standards by which to evaluate an interpreter and which was intent on paying such interpreter the salary of a classroom aide." Brief of Appellant, at 20. As a result of the Secretary's opinion, an outside sign language expert was used by the school district in the process of evaluating rather than simply locating prospective interpreters and a permanent interpreter qualified within the meaning of the stated standard was, in fact, hired.
 
 
 91
 In concluding that the Secretary's opinion did accord relief to the Wheelers, I take issue with the majority's conclusion that the School District made the identical use of outside experts before and after the Secretary's decision. The School District submitted, and the district court considered, affidavits purporting to show that the School District consulted others about locating an interpreter prior to the time that the Secretary's decision was rendered. The Wheelers contend that the only qualified outside expert consulted by the school district prior to the Secretary's decision was Ms. Sarah Collins. According to the Wheelers, Ms. Collins, before the Secretary's decision, was consulted only about locating a new interpreter for Shannon. After the decision, Collins was called upon to locate and evaluate prospective candidates.
 
 
 92
 The Parents thought they made it clear to the District Court that when the Defendant said it used an outside expert to find an interpreter before the Secretary's decision that did not mean that an outside expert was ever used to evaluate prospective interpreters before the Secretary's decision. The Parents won the right to have consultation and evaluation by an outside expert only after the Secretary's decision.
 
 
 93
 Brief of Appellant, at 27 (emphasis in original).
 
 
 94
 The majority concludes that outside experts were consulted prior to the Secretary's decision. It makes short shrift, however, of the distinction drawn by the Wheelers between the use of experts to find an interpreter and the use of experts to evaluate an interpreter. It was this evaluative component, which was missing from the hiring process prior to the Secretary's opinion, that was critical to the Wheelers.
 
 
 95
 The totality of the record before us demonstrates that the litigation undertaken by the Wheelers was, at the very minimum, the catalyst that forced the School District to take steps to find an interpreter qualified to work with Shannon in particular[2] and to incorporate the use of outside experts in the evaluation of prospective interpreters. The Wheelers did, in fact, secure benefits not previously extended to them, i.e., the right to have a prospective interpreter evaluated by an expert in sign language and to have the School District consider Shannon's individual needs in the hiring of that interpreter. The fact that these benefits were secured through the administrative due process proceedings is, in my view, clearly sufficient to satisfy the threshold requirement for a fee award under the test set forth in the majority opinion.
 
 IV.
 
 96
 Because I believe that the Wheelers were indeed prevailing parties for purposes of an award of attorney fees, I would reverse the order of the district court and direct that summary judgment be entered in favor of the Wheelers.[3]
 
 
 
 [1]
 The district court found, inter alia, that the Secretary's review of the hearing officer's decision was potentially biased and illegal and therefore his special education opinion could not be relied upon by the parents. In view of our ultimate conclusion we shall assume, as the parents contend, that the Secretary's opinion was properly before the district court and is, therefore, before us
 
 
 [1]
 The order reads, in pertinent part, as follows:
 It is hereby ordered that ... the District make all concerted effort to advertise and hire a suitable interpreter for Shannon looking into all possible options for providing an equally appropriate salary scale given the possible latitude under the School Code.
 
 
 [2]
 Prior to the Secretary's opinion, the School District maintained that Kane was an appropriate interpreter for Shannon. See the April 24, 1990 letter from counsel for the School District referred to at p. 135, supra. The Secretary's opinion clearly established that this was not the case. The School District, under the terms of the Secretary's opinion, would have been required to replace Kane. Kane's resignation during the course of the proceedings does not alter the fact that the Secretary's opinion dictated a change in the School District's approach to providing an interpreter for Shannon Wheeler. The majority's assumption that the School District would have followed the course taken in securing a new interpreter even had there been no litigation is, at best, somewhat unrealistic considering all that has happened in this dispute
 
 
 [3]
 While the majority, in view of its holding, does not devote a great deal of discussion to this issue, I am compelled to note here my disagreement with the district court's conclusion that the decision in Muth v. Central Bucks School District, 839 F.2d 113 (3d Cir.1988) rev'd on other grounds sub nom., Dellmuth v. Muth, 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989) deprived the Secretary of Education of the authority to render the opinion central to this case
 In Muth, we held that "employees of the state educational agency may not conduct a review proceeding under section 115(e)" and then found that "the Secretary of Education must be considered the equivalent of an employee of Pennsylvania's state education agency for purposes of the [EHA]." Id. at 123-24. Effective July 1, 1990, new regulations promulgated by the Department of Education eliminated the Secretary as an administrative decisionmaker. 29 Pa.B. 3339 (June 16, 1990), §§ 14.64, 14.71, 20 Pa.B. at 3355-56.
 Muth 's ultimate reversal on 11th Amendment grounds apparently created some confusion with respect to the continued vitality of the state educational due process scheme. Two district court decisions, issued subsequent to Muth but involving pre-amendment secretarial review, have given some effect to the Muth holding. In Johnson v. Lancaster-Lebanon Intermediate Unit 13, 757 F.Supp. 606 (E.D.Pa.1991) and Hulme by Hulme v. Dellmuth, 1991 WL 83115, 1991 Lexis U.S. Dist. 6503 (E.D.Pa.1991), district courts, conducting de novo review of claims raised in administrative proceedings, found Muth relevant to review of the administrative record. Citing cases holding that a district court must defer to the administrative agency, the district court in Johnson concluded that "[b]ecause the Secretary was not impartial ... his decision carries no weight in this court's review of the administrative record." 757 F.Supp at 617.
 In this case, neither the school district nor the Wheelers quarrel with the decision reached by the Secretary, although they differ in their interpretation of that decision for purposes of an award of attorneys fees. Where neither party challenges the decision on the merits, it is difficult to see how the impartiality issue central to Muth has any application. Furthermore, because the district court is not asked here to conduct substantive review of the merits of the Secretary's decision, it need not look to Muth for guidance on the issue of to whom it should defer in considering the merits. The issue in Johnson and Hulme which required reference to Muth simply is not present here. Here, the district court is required only to interpret the administrative outcome, accepted by both parties, for purposes of determining an award of attorneys fees; there is no question with respect to deference and no defensible argument regarding impartiality. The rationale underlying the Johnson and Hulme decisions is, in my view, inapplicable.