

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-24-2000

# Holmes v. Millcreek Twp School

Precedential or Non-Precedential:

Docket 98-3428

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Holmes v. Millcreek Twp School" (2000). *2000 Decisions.* Paper 33.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/33

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 24, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 98-3428/3482

REBECCA H. HOLMES, a minor by parents and natural
guardians ED HOLMES and DEBBY HOLMES, his wife;
ED HOLMES; DEBBY HOLMES, in their own right

v.

MILLCREEK TOWNSHIP SCHOOL DISTRICT,

     Appellant

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 95-cv-00214E)
District Judge: Honorable Maurice B. Cohill, Jr.

Argued March 23, 1999

Before GREENBERG and ROTH, Circuit Judge
POLLAK,[1] District Judge

(Opinion filed February 24, 2000)

Antoinette Szarek, Esquire (Argued)
511 Orchard Way
Lansdowne, PA 19050

 Attorney for Appellees

_____

1. Honorable Louis H. Pollak, United States District Court Judge for the
Eastern District of Pennsylvania, sitting by designation.

Joanna K. Budde, Esquire (Argued)
Patricia K. Smith, Esquire
Knox, McLaughlin, Gornall
 & Sennett
120 West 10th Street
Erie, PA 16501

 Attorneys for Appellant

OPINION OF THE COURT

ROTH, Circuit Judge.

Appellees Ed and Debbie Holmes brought an action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. SS 1400 et seq ., to recover attorney's fees and costs. These fees and costs were incurred by the Holmeses in challenging the re-evaluation of their daughter, Rebecca Holmes, which was to be done by the Millcreek Township School ("School District"), and in protesting the qualifications of a sign language interpreter whom the School District had assigned to work with their daughter. In addition, the Holmeses sued for reimbursement by the School District of the costs of the 1994 Independent Educational Evaluation ("IEE"), which the Holmeses had had performed on Rebecca. After a bench trial, the District Court held that the Holmeses were entitled to attorney's fees and certain costs associated with the 1994 IEE and with the Holmeses' challenge to the interpreter's qualifications.

The School District appealed the award of fees and costs to the Holmeses. We will reverse the District Court's conclusion that the Holmeses were entitled to reimbursement for the 1994 IEE, but we will affirm their entitlement to an award of attorney's fees and costs. Because we find the amount of the award excessive, however, we will reduce it.

I. Factual Background

Rebecca H. Holmes is severely deaf. In the fall of 1992, as she entered the 5th grade, Rebecca transferred to the

Millcreek School District and was assigned to the School District's Belle Valley Elementary School.

Because of Rebecca's disability, School District officials made arrangements for her to undergo a comprehensive psycho-educational evaluation. The purpose of the evaluation was to assist the School District in creating a suitable Individualized Educational Plan ("IEP") for Rebecca, as required by IDEA.2 Personnel at the Center for Deafness at the Western Pennsylvania School for the Deaf (the "WPSD") performed an IEE, which was paid for by the School District. The IEE was the basis for Rebecca's IEP for the 1992-93 school year.

Rebecca's 1992-93 IEP included hearing impaired support, speech theory, and language therapy. In addition, Rebecca used a hearing aid and part-time interpreter services in the classroom. The interpreter, Kevin Feyas, was employed by the School District. In addition, on September 1, 1992, Chris DiFilippo was hired by the School District as an interpreter for deaf students at Belle Valley. DiFilippo also worked with Rebecca during the 1992-93 school year.

Rebecca continued with the same IEP during the 1993-94 school year. During 1994, however, the School District would be obligated to do a multi-disciplinary re-evaluation of Rebecca. The re-evaluation would determine Rebecca's continued eligibility for special education services and recommend a plan for the 1994-95 school year. The Holmeses did not agree with the method of re-evaluation proposed by the School District because a sign language interpreter would be used. The Holmeses believed that Rebecca should be assessed only by people who could communicate directly with her by sign language while she was being tested.

On December 6, 1993, mid-way through Rebecca's 6th grade year, Mrs. Holmes asked the School District to have the WPSD conduct an IEE of Rebecca as part of the re-evaluation. Mrs. Holmes asked the School District to pay for this second IEE. The School District refused to pay for additional assessments by the WPSD but proposed to

_____

2. See Part III.A. infra.

3

perform its own re-evaluation. The School District informed the Holmeses that the School District could perform an appropriate re-evaluation with its own experts, who were familiar with Rebecca, her academic progress, and the School District's curriculum.

After the School District refused their request to have the WPSD evaluate their daughter, the Holmeses made arrangements themselves for a WPSD evaluation of Rebecca on February 10, 1994. The resulting IEE consisted of two reports. The first, a two-page re-evaluation of Rebecca's sign language skills, was authored by Marlene Schecter-Connors. The second, a ten-page "Interview Summary," was prepared by a psychologist, Dr. Paul Loera. Dr. Loera met with Rebecca and her parents and reviewed various materials produced in 1992 by the WPSD in connection with its first evaluation of Rebecca.

On March 4, 1994, the School District filed a request for a due process hearing on the appropriateness of its proposed re-evaluation of Rebecca. Prior to the hearing, the parties engaged in mediation but were unable to reach an agreement. The Holmeses then obtained a continuance of the hearing because they were involved in another due process proceeding concerning the education of their son, Matthew, who is also hearing-impaired.

On April 4, during the period of the continuance, the School District asked the Holmeses for permission to re-evaluate Rebecca. Mrs. Holmes requested that the School District not perform any testing, evaluating, or other procedures that would result in a written report that could be incorporated into Rebecca's multi-disciplinary team ("MDT") report. Mrs. Holmes also informed the School District that she would require that WPSD-approved personnel be members of the MDT and that she had not yet received the reports of 1994 assessment which the Holmeses had had done by the WPSD. In addition, Mrs. Holmes advised the School District that she opposed the use of an interpreter in the re-evaluation.

During April, May, and June, Dr. Richard Lansberry, a school psychologist, compiled Rebecca's Comprehensive Evaluation Report ("CER") for the MDT. The data in the

CER included the WPSD 1992 IEE of Rebecca, evaluations from Rebecca's speech therapist, and a language evaluation of Rebecca by Kevin Feyas. Dr. Lansberry also informally interviewed Rebecca, with Kevin Feyas serving as interpreter.

On April 28, Mrs. Holmes again requested a detailed description of any testing of Rebecca by the School District. She also reminded the School District that she would not consent to any testing to re-evaluate Rebecca. A copy of the draft CER was sent to the Holmeses on July 7, 1994, nine days after the WPSD's 1994 IEE reports was transmitted to the School District.

At the start of the 1994-95 school year, two MDT meetings were held, with the Holmeses present, to develop an IEP for Rebecca. The resulting four-page CER stated that Rebecca "will have access to a sign language interpreter throughout all of her school day" and access to structured study guides. In response to the CER, the Holmeses wrote a dissenting opinion in which they stated that they were dissatisfied with Dr. Lansberry's report. They contended that the CER contained errors of fact, excluded important information, and did not include information about their goal of exposing Rebecca to "the deaf community."

The new plan, based on the CER, was implemented on September 14, 1994, and was valid through June 7, 1995. Despite their dissent to the CER, the Holmeses did not object to the implementation of this plan.

In January 1995, the Holmeses requested due process consideration of their request for reimbursement for the 1994 IEE performed by the WSPD. The bill for the 1994 IEE was $400. The Holmeses presented this bill to the School District on May 16, 1995. In January 1995, the Holmeses had also raised concerns with the School District about the qualifications of Rebecca's interpreter, Chris DiFilippo. DiFilippo had become Rebecca's full-time interpreter in December 1994 after her prior interpreter, Tina Hammer, left. DiFilippo began working with Rebecca on a daily basis on January 3, 1995. On January 23, after Rebecca complained about DiFilippo, the Holmeses requested a due

process hearing regarding his qualifications. Prior to the hearing, the School District provided the Holmeses with evaluations to demonstrate that DiFilippo was qualified. The Department of Education had advised the School District to contact Beverly Hollrah of Washington, D.C., to conduct an evaluation of DiFilippo's skills. Hollrah viewed a tape of DiFilippo interpreting for Rebecca in several classes. On February 16, 1995, Hollrah informed the School District that DiFilippo had done "a very nice and satisfactory job of communicating the material presented in all classes videotaped." When later deposed, however, Hollrah stated that she did not know whether DiFilippo was qualified, that she had been unaware that a student had challenged his interpreting skills when she reviewed the tape, and that, had she been aware of the student's complaint, she would have wanted to meet with the student and get further information before rendering an assessment of DiFilippo's skills.

The due process hearing began on February 21, 1995. The Holmeses had also requested leave to obtain an independent evaluation of DiFilippo's skills. In addition, they had asked to present evidence regarding the IEE reimbursement issue. Although the School District had not yet received a bill for the IEE, the Holmeses' counsel advised the School District of the approximate cost of the IEE.

At the February 21 hearing, the Holmeses received Hollrah's report. At the same time, the Hearing Officer announced that Marilyn Mitchell of the National Technical Institute for the Deaf would evaluate DiFilippo's skills on behalf of the Holmeses. The Holmeses had chosen Mitchell to evaluate DiFilippo without input from the School District, and the Holmeses paid for Mitchell's services. On March 21, Mitchell reported that in her opinion DiFilippo was not an adequate interpreter for Rebecca.

On March 8, however, prior to Mitchell's report and before anyone was familiar with its contents, DiFilippo requested to be relieved of the interpreter position and to be transferred to the position of "special education assistant." The request was made in part because DiFilippo did not want to undergo the stress and potential harassment of a

6

hearing on his qualifications.3 On March 9, the School District notified the Holmeses that DiFilippo had applied for the new position, and, on March 20, the School District approved DiFilippo's transfer to the position of special education assistant.

Despite DiFilippo's transfer to a new job, when the due process hearing was reconvened on March 21, the Hearing Officer concluded that the issue of DiFilippo's qualifications was not moot. The hearing officer came to this conclusion because he found that a decision on DiFilippo's qualifications would be helpful in resolving Rebecca's claim for compensatory education during the period in which DiFilippo had served as her interpreter.

On April 6, the School District offered tutoring to Rebecca. The tutoring was to consist of one hour for each of the forty seven days that DiFilippo had worked with Rebecca, although the School District informed the Holmeses that it "[did] not agree with the parents' characterization that Mr. DiFilippo . . . [was] not qualified." The Holmeses rejected the offer, apparently because of Rebecca's schedule of extracurricular activities. The School District then asked what, other than the tutoring, could be provided to help Rebecca in her studies. The Holmeses requested study guides for math, a subject in which the School District had determined that Rebecca was weak, regardless of her disability.

On June 1, 1995, after nine days of proceedings, the Hearing Officer decided that the parents were entitled to reimbursement for the 1994 IEE. Specifically, the Hearing Officer concluded that "it is clear that the private evaluations secured by the parents provided meaningful information which helped to determine the nature and extent of Rebecca's disability along with necessary programming." The Hearing Officer did not, however,

_____

3. DiFilippo already was familiar with such hearings because his brother Dean had served as an interpreter for Rebecca's brother. Dean DiFilippo had undergone a due process hearing, initiated by the Holmeses, over his qualifications. Chris DiFilippo had attended the hearing, witnessed the way in which the process had unfolded, and seen that the Holmeses had prevailed against his brother.

7

determine whether it was appropriate to perform an evaluation of Rebecca with the assistance of a sign language interpreter. The Hearing Officer concluded that it was "beyond the scope of this hearing to determine if Rebecca must be assessed only by people who can directly sign with her as she is being tested for an appropriate evaluation."

The School District appealed. On July 28, 1995, the Special Education Due Process Appeals Review Panel unanimously reversed the Hearing Officer's determination. The Panel concluded that the School District did not have to reimburse the Holmeses for the 1994 IEE because the Hearing Officer had committed legal error when he did not consider whether the School District could provide an "appropriate" re-evaluation. Instead, the Hearing Officer had focused on whether the School District had used information derived from the evaluation done by the Holmeses' experts.[4] Quoting the opinion in Kozak v. Hampton Township Sch. Dist., 655 A.2d 641, 647 (Pa. Commw. 1995), the Panel stated "[a]ccording to the plain language of [Pennsylvania regulations], parents are entitled to reimbursement for a private evaluation only if . . . the private evaluation shows the school district's MDE to be inappropriate." The Panel further noted that the Holmeses' requirement, that the evaluator be fluent in sign language and that an interpreter not be employed, had not been adopted by either Pennsylvania or federal statutes or regulations. For that reason, the Holmeses were not justified in demanding reimbursement for their IEE on the basis that the re-evaluation proposed by the School District was inappropriate.

_____

4. Both the Hearing Officer and the Review Panel concluded that the issue of whether DiFilippo was qualified had been settled; thus, neither one determined whether the interpreter was qualified. See app. at 1318 ("When Rebecca's hearing began a second issue regarding qualifications of her interpreter was introduced. . . The parties eventually reached an agreement on the issue of the interpreter and the sole remaining issue was concerned with the request for reimbursement for the independent evaluations."); App. at 1332, n. 21 ("Early in the course of the protracted proceedings, the added issue of the qualifications of Rebecca's interpreter, and the corollary questions of compensatory education services and substitute interpreter qualifications, were resolved.").

Subsequently, the Holmeses sought payment of attorney's fees, incurred up to that time, in the amount of $53,445.74. The School District denied the Holmeses' claim on the ground that the parents had not been a prevailing party in the due process hearings.

On August 14, 1995, the Holmeses filed suit in the United States District Court for the Western District of Pennsylvania. They requested attorney's fees and costs as the prevailing party within the meaning of 20 U.S.C. S 1415. The Holmeses claimed to be the prevailing party because 1) they were successful in demanding reimbursement for the IEE and 2) as a result of the due process hearings, the School District had reassigned DiFilippo, had assigned another interpreter to Rebecca, had offered compensatory education for the period that DiFilippo had been assigned, and had agreed not to use Chris or Dean DiFilippo as substitute interpreters.

After a 3-day trial, the District Court announced its opinion from the bench. The court found that the Holmeses were the prevailing party. It reversed the Appeals Review Panel's denial of reimbursement for the cost of the 1994 IEE because portions of the IEE had been used by the School District to formulate Rebecca's CER. The court did not analyze whether the School District could itself have conducted, or did conduct, an appropriate re-evaluation. On August 27, 1998, the District Court issued an order awarding attorney's fees of $141,070.28 to the Holmeses.

The School District appealed the award of attorney's fees and costs, as well as the award of costs associated with the 1994 IEE. We have jurisdiction of this appeal pursuant to 28 U.S.C. S 1291.

II. Standard of Review

The District Court's findings of facts are reviewed for clear error. Sheet Metal Workers Local 19 v. 2300 Group, Inc., 949 F.2d 1274, 1278 (3d Cir. 1991). We have plenary review over the District Court's choice, interpretation and application of the law to the facts. Epstein Family Partnership v. Kmart Corp., 13 F. 3d 762, 765-66 (3d Cir. 1994). Generally, we review a fee award for abuse of

discretion. Kean v. Stone, 966 F.2d 119, 121 (3d Cir. 1992).
Where, however, the question is whether the District Court
applied the correct legal standard, our review is plenary. Id.

III. Discussion

A. Statutory Framework

IDEA establishes minimum requirements for the
education of children with disabilities.5  The statute requires
states to provide such children with a "free[and]
appropriate public education," which is based on the
unique needs of each individual student.6  20 U.S.C. S 1412.
School districts achieve this goal by developing a detailed
instructional plan, or an IEP, for each child who is
classified as disabled. 20 U.S.C. S 1401(a)(18). An IEP
consists of a specific statement of a student's present
abilities, goals for improvement of the student's abilities,
services designed to meet those goals, and a timetable for
reaching the goals by way of the services. Id . at
S 1401(a)(20). The Congressional purpose in enacting IDEA
was to provide "access to a `free appropriate public
education' . . which . . . is . . sufficient to confer some
educational benefit upon the handicapped child." Board of
Education v. Rowley, 458 U.S. 176, 200 (1982). In this way,

_____

5. IDEA was enacted "to assure that all children with disabilities have
available to them . . . a free appropriate public education which
emphasizes special education and related services designed to meet their
unique needs [and] to assure that the rights of children with disabilities
and their parents or guardians are protected." 20 U.S.C. sec. 1400(c).

6. A "free appropriate public education" is defined in 20 U.S.C. sec.
401(a)(18) as special education and related services that--

        (A) have been provided at public expense, under pu blic supervision
        and direction, and without charge,

        (B) meet the standards of the State educational ag ency,

        (C) include an appropriate preschool, elementary, or secondary
        school education in the State involved, and

        (D) are provided in conformity with the individual ized education
        program required under section 1414(a)(5) of this title.

See also 22 Pa. Code S 14.1 ("appropriate program").

10

the IEP provides a "basic floor of opportunity" but not necessarily "the optimal level of services . . .." Carlisle Area School v. Scott P. By and Through Bess P., 62 F.3d 520, 533–34 (3d Cir. 1995).

States that receive IDEA funding must create an administrative structure to develop IEPs. 20 U.S.C. S 1414(a)(5). In addition, states must establish procedural safeguards for children with disabilities and for their parents; among the most important of these safeguards is allowing parents to dispute the appropriateness of their child's IEP through an impartial due process hearing. 20 U.S.C. S 1415.

Under Pennsylvania law, an IEP is defined as "[A] written plan for the appropriate education of an exceptional student." 22 Pa. Code S 14.31(b).7 The Commonwealth requires an IEP to include: 1) a statement of the student's present levels of educational performance; 2) a statement of annual goals and short–term learning outcomes which are responsive to the learning needs identified in an evaluation report; and 3) a statement of the specific special education services and programs and related services to be provided to the disabled student. 22 Pa. Code S 14.32(f). Parents may request due process hearings about the appropriateness of the IEP pursuant to 22 Pa. Code S 14.64(a). 8

B. Reimbursement for the IEE

Pennsylvania regulations allow parents to be reimbursed for a private evaluation of a disabled student if that evaluation was sought as a result of the parent's

_____

7. Pennsylvania defines the term "exceptional children" as "children of school age who deviate from the average in physical, mental, emotional or social characteristics to such an extent that they require special educational facilities or services . . . ." Pa. Stat. Ann. Title 24, S 13–1371(1).

8. 22 Pa. Code S 14.64(a) provides:

   "Parents may request an impartial due process hearing concerning
   the identification, evaluation or educational placement of . . . a child
   who is eligible or who is thought to be eligible, if the parents
   disagree with the school district's identification, evaluation or
   placement of . . . the student . . . ."

11

disagreement with the school's MDE, and if the evaluation then demonstrates that the school's MDE was in some way inappropriate. See Kozak, 655 A.2d at 647.

The record here shows that the Holmeses sought the services of the WPSD only after informing the School District of their belief that it could not properly re-evaluate Rebecca. Thus, prior to obtaining an IEE, the Holmeses met their burden of stating their disagreement with the School District's process of evaluating their daughter. The crucial issue is, however, whether the Holmeses demonstrated that the School District's evaluation of their daughter was inappropriate.

First, we note that the District Court did not directly address the issue. The court's only reference to whether the School District's evaluation was appropriate was oblique: "Rebecca got a full-time interpreter because of evaluation initiated by the parents, not the school district." Thus, rather than considering whether the School District's re-evaluation was appropriate, the court focused on the School District's purported reliance on the WPSD report in formulating Rebecca's educational plan.

This was error. The School District is required by federal and state law to consider all evaluations of disabled students. See 34 C.F.R. S 503(c) (stating that if the parents obtain an IEE at private expense, the results "[m]ust be considered by the public agency"); see also 22 Pa. Code S 14.67(c)("if parents obtain an IEE at private expense, the results . . . shall be considered by the district in decisions made with respect to the provision of a free appropriate public education to the student."). For that reason, the fact that the School District considered the WSPD's second evaluation of Rebecca does necessarily indicate that reimbursement is required.

The Holmeses may be reimbursed for the WPSD IEE only by showing that the School District's 1994 re-evaluation would be inappropriate. Bernardsville Board of Education v. J.H., 42 F.3d 149,157 (3d Cir. 1994). The Holmeses have not shown this. Although the Holmeses contend that the School District's evaluation was inappropriate because of the lack of expertise of the individuals who conducted it,

12

they base their position not on statutory or regulatory language but on expert opinions which do not have the force of law.

The Holmeses argue that the Pennsylvania Department of Education's 1995 Guidelines on the "Education of Students with Hearing Loss" supports their position. The Holmeses are correct that these guidelines recommend the use of a psychologist fluent in sign language or in another form of communication preferred by the student, in evaluating hearing disabled students. ("The participation of the psychologist is necessary in any MDT. . .. It is critical that the psychologist be fluent in the communication mode and psychological/linguistic uniqueness of the student") (citing Pa. Dept. of Educ., Guidelines for the Education of Students with Hearing Loss (1995)). These guidelines do not, however, establish law. As the Appeals Review Panel noted, these Guidelines suggest an optimum level of educational services and were made for purposes of advocacy. They were not binding on the School District at any time relevant to this suit.9 See App. at 1336 ("Even if there is only one school of thought in the modern literature of deaf education regarding [whether a non-fluent psychologist can appropriately evaluate deaf students] . . . there is currently a difference between the professional optimum and the legal minimum.") (citations omitted). Thus, the Board concluded, "contrary to the parents assertion, neither Pennsylvania or federal statutes and regulations have adopted [the Holmeses'] position."10

The Holmeses go on to assert that the school psychologist, Dr. Lansberry, was not fluent in American

_____

9. As a way of emphasizing this point, we note that the Guidelines were still in advance copy form at the end of the school year 1994-1995, and that although the Guidelines were distributed to schools in August of 1995, it is not clear when they were in the possession of the relevant officials at the Millcreek School District. See app. at 1613.

10. In addition, a circular from the Pennsylvania Department of Education, dated March, 1992, recommended that when a student's disability involves hearing loss, the MDT should"include evaluators knowledgeable about deafness/hearing impairment." The department noted, however, that when such evaluators are not available, a "qualified interpreter must be utilized during evaluations and conferences."

13

Sign Language ("ASL") and, thus, could not evaluate Rebecca appropriately. They claim that Dr. Lansberry "admitted that he was not qualified to evaluate Rebecca's need for interpreting services." In addition, the Holmeses argue that Kevin Feyas, who served as Dr. Lansberry's interpreter, was not credentialed as either an interpreter or a psychologist and thus could not have contributed to an appropriate evaluation of Rebecca.

It is not disputed that Dr. Lansberry is not fluent in ASL. We do not, however, accept the Holmeses' contention that Dr. Lansberry's lack of fluency in ASL signifies that the School District's MDE was inappropriate. First, the Supreme Court has ruled that we must not substitute our judgment about proper education methods for that of state educational authorities. Rowley, 458 U.S. at 207. We must give "due weight" to the underlying state administrative proceedings. Id. at 206. In the instant action, the Appeals Review Panel concluded that Dr. Lansberry and others were able to evaluate Rebecca appropriately. We give due deference to that finding.

We also note that, although we must consider administrative fact findings, we have not interpreted Rowley as requiring us to accept such findings. See Carlisle Area School, 62 F.3d at 529. Here, however, we do notfind sufficient evidence in the record to persuade us that we should second-guess the findings of the Board and the opinion of the School District. We find no indication that Dr. Lansberry, with the aid of Kevin Feyas, rather than the hypothetical psychologist trained in ASL, could not appropriately evaluate Rebecca. Dr. Lansberry testified that, with the help of translators, he had dealt with deaf children in the past. Although he believed that the MDT should include persons familiar with a deaf child's needs and persons who could communicate directly with the deaf child, he did not agree that he had to be fluent in sign language in order to appropriately assess Rebecca for purposes of creating an IEP. We conclude that Dr. Lansberry provided valuable information concerning Rebecca's need for increased interpreter services by assessing, inter alia, Rebecca's feelings about being hearing impaired, her desire for interpreter services, her academic abilities, and her academic progress.

14

Moreover, the School District's determinations about Rebecca's educational needs for the 1994-95 school year were based on the work of the entire MDT, rather than on the expertise of any one member of the MDT, including Dr. Lansberry. While ASL-fluent psychologists may be preferred, the Holmeses' own experts acknowledged that, with the help of a translator, appropriate evaluations of deaf students can be achieved by professionals who are not fluent in ASL. In addition, we find persuasive the School District's argument that their staff in some ways was better-qualified than the WPSD's staff to evaluate Rebecca. For instance, the School District's staff were familiar with the curriculum at Belle Valley and with Rebecca and the progress she was making.

Similarly, we find no support in the record for the Holmeses' argument that Kevin Feyas' participation in the MDE implies that it was inappropriate. Whereas the Holmeses suggest that Feyas was a novice in teaching the deaf at the time that he served as Dr. Lansberry's interpreter, the record shows that Mr. Feyas had worked with Rebecca for over two years and was aware of her preferred method of communication. Moreover, Feyas was familiar with the Belle Valley curriculum and had been certified by the state as a teacher for the hearing impaired. While Feyas was not certified by the Registry of Interpreters for the Deaf, a national registry, he had a provisional certification from another national organization, the Council of Education for the Deaf. These facts do not support the Holmeses' contention that Feyas was unqualified to assist in evaluating Rebecca.[11]

In sum, we hold that there has been no showing that the School District's MDE was inappropriate. Thus, we conclude that the District Court erred in finding that the

_____

11. Moreover, we note, as did the Appeals Review Panel, that the Holmeses' denial of consent to the School District for testing or any other
formal interaction with Rebecca for purposes of re-evaluation "effectively limited the School District's performance of its obligation to conduct an appropriate evaluation." As a result of this denial of consent, Dr. Lansberry was limited to reviewing, inter alia , previous evaluations of and data about Rebecca, and informal meetings with Rebecca and her interpreter, Mr. Feyas.

Holmeses were entitled to reimbursement for the IEE. As a matter of law, they were not.

C. Attorney's Fees and Costs

The District Court awarded attorney's fees and costs to the Holmeses because it found that they had prevailed in the due process hearing regarding the IEE and DiFilippo's qualifications. As to the latter, the Court found that the Holmeses had achieved three objectives: DiFilippo had been removed from his position as Rebecca's interpreter, another interpreter had been assigned, and Rebecca had received compensatory education for the period during which DiFilippo worked as her interpreter. The award of attorney's fees and costs was $141,070.28.

The Education of the Handicapped Act's fee-shifting provision states that, "[i]n any action or proceeding brought under this subsection, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents or guardian of a child or youth with a disability who is the prevailing party." 20 U.S.C. S 1415(e)(4)(B).12 Thus, the language of the fee-shifting provision of the relevant statute is permissive, rather than mandatory. To qualify as a "prevailing party" within the meaning of the provision, a litigant must demonstrate that he obtained relief on a significant claim in the litigation, that such relief effected a material alteration in his legal relationship with the defendant and that the alteration is not merely technical or de minimis in nature. See Texas State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 791-93 (1989); Hensley v. Eckerhart, 461 U.S. 424 (1983). Further, the litigant must show that there is a "causal connection between the litigation and the relief from the defendant." Institutionalized Juveniles v. Secretary of Pub. Welfare, 758 F.2d 897, 910 (3d Cir. 1985); see also Wheeler v. Towanda Area Sch. Dist., 950 F.2d 128, 131 (3d Cir. 1991). The pressure resulting from on-going litigation is sufficient to

_____

12. The standards governing the award of attorneys' fees under 42 U.S.C. S 1988 are applicable to awards sought under the IDEA. See, e.g., Hensley v. Eckerhart, 461 U.S. 424, 433 n. 7 (1983); Jodlowski v. Valley View Community Unit Sch. Dist. No. 365-U, 109 F.3d 1250, 1253 n. 2 (7th Cir. 1997).

satisfy this standard. Baumgartner v. Harrisburg Hous. Auth., 21 F.3d 541, 545-50 (3d Cir. 1994) (affirming viability of "catalyst theory," by which plaintiffs are eligible for fees without obtaining a judgment or formal settlement, as long as they prove that the suit accomplished its objective); see also D.R. v. East Brunswick Bd. of Educ., 109 F.3d 896, (3d Cir. 1997) (settlement agreement voluntarily and willingly entered into by school district and parents of handicapped child during IDEA mediation created binding contract between parties and was enforceable); cf. Farrar v. Hobby, 506 U.S. 103, 112 (1992) (holding that plaintiff who wins nominal damages is prevailing party under section 1988, but finding attorney's fee award inappropriate).13

The District Court concluded that the Holmeses were a prevailing party pursuant to the "catalyst theory" affirmed by our circuit in Baumgartner. That is, the court concluded that "but for the [due process] hearings,[Chris DiFilippo] would have stayed at his original position." Because of the facts that the Holmeses initiated the hearing process, that DiFilippo resigned, and that a new interpreter was assigned, the court found that the Holmeses had achieved their desired relief.

In support of its argument that the attorney's fee award was in error, the School District cites cases holding that plaintiffs may only be considered a prevailing party if the defendant's change of conduct is required by a lawsuit or a "lengthy enforceable settlement agreement." E.g. Patricia E. v. Board of Education of Community High School Dist. No. 155, 894 F. Supp. 1161 (N.D.Ill. 1995). The School District argues that the facts of this case are at odds with this standard. The School District also asserts that the"but for" analysis employed by the District Court does not comport with Baumgartner. The School District contends that the catalyst theory requires "legal change" favorable to the

_____

13. The Supreme Court recently in Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 120 S.Ct. 693, 711-12 (2000), noted the circuit split on the viability of the "catalyst theory" post-Farrar but
declined to address the issue in the context of that case as being premature. The Court indicated that any request for costs, including attorney's fees, must be addressed in the first instance by the District Court.

plaintiff " and that the "but for" analysis is not consistent with such affirmative change. Thus, the "but for analysis is not an adequate conception of cause" [for IDEA fee-shifting] . . . and the question of whether a party prevailed because of the legal proceeding rather than for some other reason is, at a minimum, a question about causality." See Board of Education of Downers Grade School Dist. No. 58 v. Steven L., 89 F.3d 464, 469 (7th Cir. 1996) (quoting Brown v. Griggsville Comm. Unit School Dist. No. 4, 12 F.3d 681, 684 (7th Cir. 1993)).

We agree that this is not a classic situation for application of the catalyst theory, B.K. v. Toms River Bd. of Educ., 998 F. Supp. 462 (D.N.J. 1998), because the record does not show definitively that the School District replaced DiFilippo in order to appease the Holmeses. Rather, the record shows that DiFilippo left the job of his own accord. Moreover, the record shows that, even when notifying the Holmeses that it would provide tutoring for Rebecca for the period that DiFilippo had served as her interpreter, the School District maintained its disagreement with the Holmeses' opinion about his qualifications.

Nevertheless, the record also demonstrates that the Holmeses' objective of no longer having DiFilippo serve as an interpreter for Rebecca was achieved as a direct result of the due process hearing that they initiated. It was because of the potential for stress and embarrassment that DiFilippo left the interpreter's job. Although DiFilippo's decision to leave the position as interpreter and take another (significantly lower-paying) job say seem to have been a personal one, it was causally influenced by the Holmeses' initiation of the hearing. This sequence of events satisfies the Baumgartner standard. See 21 F.3d at 547-48. That the School District offered tutoring to Rebecca for the period during which DiFilippo was her interpreter buttresses the inference that the Holmeses' challenge to DiFilippo's qualifications resulted in the requisite "legal change" needed to demonstrate success for purposes of an award of attorney's fees and costs.

This case is distinguishable from Wheeler v. Towanda Area Sch. Dist., 950 F.2d 128 (3d Cir. 1991), a case upon which the School District relies in challenging the

18

attorney's fee award. In Wheeler, the parents of a disabled student challenged the qualifications of the interpreter assigned to work with their child. We affirmed the denial of an attorney's fee award to the parents who made that challenge. Id. at 132. We did so, however, because we concluded that the parents had not shown a causal connection under either of their theories between their lawsuit and the hiring of a new interpreter. Id. We noted that the school district had begun searching for a new interpreter months before the resolution of the administrative action initiated by the Wheelers, based, in part, on the fact that the interpreter had fallen ill.

By contrast, our affirmance of the District Court's finding in this case is based on the fact that DiFilippo's departure from the position as Rebecca's interpreter was motivated by the Holmeses' actions, in particular, the stress and harassment that DiFilippo believed he might suffer as a result of the due process hearing. Having achieved their objective of having DiFilippo removed as Rebecca's interpreter, the Holmeses are entitled to an award of attorney's fees. See Texas State Teachers Ass'n , 489 U.S. at 791–93.

Nevertheless, we find that the amount of the award was excessive. First, the Holmeses are no longer the prevailing party on the issue of reimbursement for the 1994 IEE. In addition, we note that both the Hearing Officer and Appeals Review Panel felt that the Holmeses and their counsel had "contributed to" the needlessly "protracted proceedings." We also note that the Holmeses bear the burden of establishing the reasonableness of the requested fees and are required to submit evidence to support their claims for hours expended in performing specified tasks. See Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990) (quoting Hensley, 461 U.S. at 433; Washington, 89 F.3d at 1037.

The accepted procedure for determining a reasonable fee award is to multiply reasonable hours expended on a matter by a reasonable billing rate for the attorneys who performed the tasks involved. Washington, 89 F.3d at 1035. A reasonable hourly rate is calculated according to the prevailing market in the community. Id. An attorney's showing of reasonableness must rest on evidence other

19

than the attorney's own affidavits. Blum v. Stenson, 465 U.S. 886, 895-96 n. 11 (1984). Moreover, the court must be careful to exclude from counsel's fee request "hours that are excessive, redundant or otherwise unnecessary. .. ." Hensley, 461 U.S. at 434.

Relying upon the cases that we have cited, supra , the School District argues that neither the requested hourly rate of the Holmeses' counsel, nor the hours expended in performing tasks for this litigation, is reasonable. The School District argues that counsel for the appellees failed to produce sufficient evidence that her rate request is commensurate with her skill, experience, and reputation in the community. She offers only her own affidavit in support of her rate and bases the rate on the prevailing hourly rate in Philadelphia or statewide. The School District is correct in contending that counsel's own affidavit may not be sufficient support for her hourly rate. Blum , 465 U.S. at 895-96 n. 11.

The School District also argues that the fee award contains repetitive and unnecessary billing by counsel for the appellees. The School District lists twenty-nine such instances of excessive billing, including: 111.5 hours for preparing an answer and brief in opposition to the School District's Exceptions to the Hearing Officer's decision; forty-six hours for preparing the complaint in this action; two and a half hours for preparing a self-executing disclosure; eighty-seven hours for the taking of and preparing for depositions regarding DiFilippo's qualifications; ten and one-half hours for preparing a pre-trial narrative statement; ninety-five and three-fourths hours for preparing, inter alia, motions in limine, motions for sanctions, and responses regarding DiFilippo's qualifications; twenty-five hours for taking the deposition of Marilyn Mitchell regarding DiFilippo's qualifications; and thirty-seven and a half hours for drafting a response to allegedly inaccurate and inadmissable statements in the School District's proposed findings of fact and conclusions of law.

Counsel for the appellee contends that the award is not excessive, based on the degree of success she achieved in this litigation, the four-plus years spent in litigation over the issues involved in this action, the "risk of nonpayment"

20

assumed "when she undertakes to represent parents of deaf and hard of hearing students," and her status as a sole practitioner whose adversaries in disability rights cases invariably are "prestigious law firms." Counsel cites no law in support of her billing practices, other than Bernardsville, Brd. of Educ. v. J.H., 817 F. Supp. 14, 23 (D.N.J. 1993), aff 'd in part, 42 F.3d 160, 160–61 (3d Cir. 1994) for the proposition that "degree of success" is a factor to be considered in assessing fee requests, and Public Interest Group v. Windall, 51 F.3d 1179 (3d Cir. 1995) for the proposition that the relevant legal community, for purposes of determining an hourly rate, is not confined necessarily to the borders of a town.

Although the District Court has wide discretion in determining a fee award, we conclude that the fee awarded here was excessive. Our decision is predicated,first, on the fact that the Holmeses did not prevail on the reimbursement issue. Next, we find that counsel failed to properly support the hourly rate at which she requests reimbursement. We also find the fee breakdown provided in her billing records out of line with what is reasonable for counsel of the level of experience in litigating disability rights cases that counsel claims; with experience, the amount of time spent performing routine tasks in an area of one's expertise should decrease. Most significantly, we question the necessity of the great amount of time claimed by counsel for, inter alia, exploring DiFilippo's qualifications; we disagree with counsel's apparent understanding of her degree of success, in light of the outcome on appeal; and finally we find that this litigation was needlessly protracted, extending far beyond what was reasonable, given the nature of the issues involved in this case, which are not novel. Moreover, we note that this is not a case in which the school district has been intransigent or willfully undermining a disabled student's education; rather, it is apparent from the record that the School District meant to comply with the letter and spirit of the IDEA. Thus, this case should have been resolved years ago.

Based on our conclusion that the fees claimed here are not reasonable, we will reduce the award of attorney's fees

21

and costs to one-fourth of the original $53,445.74 fee demand made by the Holmeses.

IV. Conclusion

For the foregoing reasons, we conclude that the District Court erred in requiring reimbursement to the Holmeses for the IEE. We will, however, affirm an award of attorney's fees and costs to the Holmeses, but, because we find that the award of fees excessive, we reduce it to $35,267.57, one-fourth of $141,070.28 awarded by the District Court.

22

GREENBERG, Circuit Judge, concurring and dissenting.

I join in the majority's opinion except to the extent that it sustains any attorney's fee being paid to the Holmeses. Inasmuch as I depart from the majority's conclusion on the Chris DiFilippo matter, in my view the Holmeses were not prevailing parties under 20 U.S.C. S 1415(i)(3)(B), previously 20 U.S.C. S 1415(e)(4)(B), in any respect. The majority indicates that this case "is not a classic situation for application of the catalyst theory because the record does not show definitively that the School District replaced DiFilippo in order to appease the Holmeses." Majority Opinion at 18 (citation omitted). I certainly agree with that statement as the record cannot even support an inferential conclusion that the School District replaced DiFilippo to appease the Holmeses or for any other purpose. To the contrary, DiFilippo left his interpreter position because, as the majority recognizes, he "did not want to undergo the stress and potential harassment of a hearing on his qualifications." Majority Opinion at 6-7. Thus, as the majority recites, "the record shows that DiFilippo left the job of his own accord." Majority Opinion at 18. Nothing could be clearer.

Obviously DiFilippo had good reason to take such action for, as the majority points out, he was familiar with proceedings under the IDEA. Accordingly, he knew what to expect at the anticipated hearing. In the circumstances, who could blame him for seeking a new position in order to stay out of this litigation?

In any event, even if DiFilippo should not have been intimidated by the Holmeses' challenge to his qualifications, the fee award still is unjustified. After all, at least to the best of my knowledge, we never have applied the "catalyst theory" to award a plaintiff fees against a defendant in circumstances in which a plaintiff, as here, does not obtain any relief by judgment or settlement from the defendant and the defendant has done nothing to change its behavior "to eliminate the complained-of conduct." See Baumgartner v. Harrisburg Housing Auth., 21 F.3d 541, 544 (3d Cir. 1994). As we indicated in Institutionalized Juveniles v. Secretary of Public Welfare, 758 F.2d 897, 910 (3d Cir. 1985) (emphasis added), dealing with a fee application

23

under 42 U.S.C. S 1988, "a court must decide whether plaintiffs are prevailing parties and whether there is a causal connection between the litigation and the relief obtained from the defendant." While there can be no doubt that DiFilippo took action which satisfied the Holmeses, he never has been a party to these proceedings in either their administrative or judicial aspects. Moreover, the Holmeses are not seeking any fees from him nor could they do so. Furthermore, the administrative hearing authorities' view that the matter of DiFilippo's qualifications was settled merely was a recognition that the issue was moot. Obviously, because the defendants neither unilaterally nor by agreement with the Holmeses removed DiFilippo as an interpreter, the parties to this litigation did not settle the case.

Inasmuch as DiFilippo by his action mooted the controversy over his qualifications, no party could prevail on that issue and none has done so. Thus, we are not concerned here with the policy considerations we set forth in Baumgartner, i.e., if a defendant unilaterally could moot the underlying case by conceding to a plaintiff 's demands attorneys might be reluctant to bring civil rights suits. Id. at 548. In this regard I emphasize that there is no suggestion in the record that the defendants acted in collusion with DiFilippo to moot the issues involving him. Thus, the defendants did not urge DiFilippo to apply for the new position to which he was transferred.

I want to point out that the majority's opinion is very significant as it cannot be limited to IDEA cases. The provision that a fee may be awarded to a "prevailing party' in 20 U.S.C. S 1415(i)(3)(B) is reflected in other statutes. For example there are "prevailing party" provisions in the civil rights, 42 U.S.C. S 1988, and employment discrimination, 42 U.S.C. S 2000e-5(k), statutes. As a result of this case we may anticipate that in future litigation in which plaintiffs obtain relief by reason of the actions of persons not parties to litigation they will seek fees from the defendants.

Finally I want to point out that the Supreme Court recently in Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 120 S.Ct. 693, 711-12 (2000), pointed out that there now is some question as to

24

the continuing validity of the catalyst theory, although it indicated that it would be premature to address the issue in the context of that case. While I certainly recognize that the catalyst theory is followed in this circuit, in view of the Court's opinion in Laidlaw, we should not extend it.

In view of the foregoing, while I agree completely with the majority that the IEE reimbursement should not be allowed, I would reverse the order awarding fees in its entirety.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

25